**UNITED STATES v. STOTT et ux.**

No. 12613.

Circuit Court of Appeals, Eighth Circuit.

Feb. 15, 1944.

Roger P. Marquis, Atty., Department of Justice, of Washington, D. C. (Norman M. Littell, Asst. Atty. Gen., Clinton R. Barry, U. S. Atty, of Fort Smith, Ark., John E. Harris, Sp. Asst. to the Atty. Gen., and Vernon L. Wilkinson, Atty., Department of Justice, of Washington, D. C., on the brief), for appellant.

J. Bruce Streett, of Camden, Ark. (O. E. Westfall of Camden, Ark., on the brief), for appellees.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge, delivered the opinion of the Court.

The United States appeals from a judgment in a condemnation proceeding. The question is whether the appellees were bound by an agreement made prior to the institution of the action fixing the value of the lands taken.

On March 23, 1939, the appellees, Dan W. Stott and his wife, Maude Stott, executed and delivered to the United States seven options to purchase seven tracts of land, including in all 814 acres, for use in a land conservation project being developed by the Secretary of Agriculture under authority of the Bankhead-Jones Farm Tenant Act, 7 U.S.C.A. §§ 1010–1013. The options are identical except for the descriptions of the land involved, the considerations stated, and certain reservations of mineral rights. The important provisions in each option are: (1) the offer of appellees to convey a valid title in fee simple, to furnish the Government such abstracts of title as appellees might have, and to assist in securing other necessary evidence of title; (2) the provision that the United States should have six months from the

execution of the options by appellees in which to accept them and thereafter "a reasonable time within which to secure an abstract or certificate of title and have the same examined;" (3) a stipulation that, in the event the United States found the title to the land to be unsatisfactory for purchase, title might be acquired by condemnation or other legal proceedings, and the options introduced at the trial "as final and binding evidence of the true value of said land and of the proper award to be made in such proceedings;" (4) the agreement of the United States, upon acceptance of the options, to acquire the land described at the consideration stated "if the land may be so acquired in accordance with the terms of this option;" and (5) the requirement that, pending completion of the transaction, appellees should discharge all taxes assessed on the land and assume all risk of loss or damage to improvements.

While the United States took seven separate options to purchase seven separate tracts of land, the real agreement between the parties was for the sale to the United States of all of the appellees' lands, amounting to a fraction of an acre less than 814 acres, at an agreed price of ten dollars an acre. Dan W. Stott so testified without denial or objection on the part of the United States. The reason for the seven separate options, as explained by counsel of the project office at Camden, Arkansas, was a regulation of the Department of Agriculture prohibiting the inclusion in one option of noncontiguous tracts of land. This Government witness testified that, when the options were presented to appellees for their signatures, they objected to the execution of seven separate options on the ground that they had agreed to sell to the United States all of the land and because of the considerations stated in the options for the separate tracts. On the explanation by Government's counsel of the reason for the separate options, and upon his assurance that they were taken merely to conform to Department regulations, the appellees affixed their signatures.

The Department of Agriculture had appraised the several tracts of land prior to the preparation of the options. Department counsel, who prepared the options, testified that he assigned to each separate tract an arbitrary consideration which was within its appraised value. Some of the options recited a consideration of less and some of more than ten dollars an acre, but the total

of all considerations stated in the separate options was $8,140, the separate considerations having been calculated so as to obtain that result. Later, when the title to one of the tracts was found to be satisfactory, the appellees declined to accept the Government's offer of payment of the consideration stated in the option taken on that tract, on the ground that it was less than the agreed price per acre, and also because the agreement between the parties was for the purchase of all of the land and not of individual tracts. Apparently representatives of the Department of Agriculture assented to this interpretation of the option agreements.

All of the options were accepted by the United States on the 17th day of August, 1939. Between the 6th and 22d of September, 1939, the office of the Department of Agriculture in charge of the project at Camden, Arkansas, near which place the lands were located, ordered abstracts of title. The abstracts were received at the Camden office at different times in September and October, and all were forwarded to the Department office at Fort Worth, Texas, for examination by the 15th day of November, except the abstract covering one tract. That abstract, received at Camden on October 11, 1939, was not forwarded to Fort Worth until July 30, 1940. So-called curative opinions, prepared by Department counsel at Fort Worth, were returned to the Camden office in January, February, and March 1940, with the exception of the last-mentioned abstract on which an opinion of counsel was not returned to the Camden office until October 31, 1940. These opinions required further evidence of title with respect to some of the tracts. On demand of the Camden office, appellees furnished such requested additional evidence of title as it was possible to secure. But fatal defects existed in the title to two of the tracts. In the case of one tract of 40 acres, the abstract showed title in a Mrs. Loda. The title to another tract of 39 acres appeared to be in the heirs of one Cordell. Appellees were unable to purchase from Mrs. Loda. They denied the Cordell claim. The United States made no serious effort to obtain releases or acquire title either from Mrs. Loda or the Cordell heirs. And, although it was apparent by March 1940 that the title was not such as to permit acquisition of all the lands by purchase and that condemnation or other legal pro-

ceedings would be necessary to their acquisition by the United States, nothing was done to that end until August 14, 1941, when the present suit for condemnation was instituted, a declaration of taking made and filed, and the stipulated price of $8,140 deposited in the registry of the court. On August 21, 1941, the court entered judgment vesting title in the United States. Summons on appellees was not issued until December 6, nor served until December 16, 1941.

Shortly after the acceptance of the options by the United States in August 1939, the appellees began to demand the conclusion of the transaction and the payment of the purchase price. They were advised by Government counsel at the Camden office that the matter would be concluded within 30 to 60 days. Appellees continued to call at the Camden office at intervals of 30 to 60 days throughout the year 1940 to complain of the delay in closing the contract and to insist upon performance. On each call they were advised to return again and were assured that the matter was receiving preferred attention. While it is clear that throughout the year 1940 the appellees were complaining seriously of the delay, it is equally clear that they acquiesced in it, and, by their conduct, assented to each extension of time suggested by the United States until January 7, 1941, on which date the appellees sent to the Secretary of Agriculture at Washington, D. C., seven letters announcing the cancellation of the seven options executed by them on the ground of unreasonable delay on the part of the United States in concluding the transaction. To these letters the Department replied, on February 1, 1941, that the options constituted a valid contract between the parties for the sale of the land, which could not be terminated by the notice of appellees, but only by agreement between the parties. The record does not show any further communication between the United States and appellees prior to the trial of the condemnation suit.

In their answer to the complaint for condemnation, the appellees relied upon their purported cancellation of the options as of January 7, 1941; asserted that they were not bound by the options because of unreasonable delay on the part of the United States; and asked that the value of the lands condemned be fixed as of August 21, 1941, the day upon which judgment was entered vesting title in the United States.

They admitted the title of Mrs. Loda to the 40-acre tract, and denied the title of the Cordell heirs. On the trial of the case the District Judge concluded that the United States had lost its rights to enforce appellees' agreement as to the value of the lands in the condemnation proceeding because of unreasonable delay. He charged the jury that appellees were entitled to recover as damages the fair market value of the land on the date of its taking. The Loda and Cordell claims were sustained. The jury returned a verdict on behalf of appellees in the sum of $12,948. Mrs. Loda and the Cordell heirs received awards totalling $1,892. From the judgment entered on this verdict, the United States has appealed, but no point is made here against the judgments in favor of Mrs. Loda and the Cordell heirs. Error is assigned in the court's finding of unreasonable delay upon the part of the United States, avoiding the option agreements, and in the court's refusal to deduct from appellees' judgment the recoveries of Mrs. Loda and the Cordell heirs.

We agree with the conclusion of the District Judge that the United States was required to tender performance under the option agreements within a reasonable time after their acceptance, Boswell v. United States, 5 Cir., 123 F.2d 213; and that whether the Government met its obligation in this respect was, under the evidence in this case, a question of law for the court, Quinn v. Olsen, 8 Cir., 298 F. 704; Hamilton v. Phoenix Ins. Co. of Hartford, 6 Cir., 61 F. 379; Morton v. Roanoke City Mills, Inc., 4 Cir., 15 F.2d 545, 546.

Making every allowance for the usual and necessary slowness of official action in transactions of this character, the evidence, nevertheless, shows an unreasonable delay upon the part of the United States. All that was necessary to be done to complete the transaction after the acceptance of the options was the preparation of abstracts of title and the examination of them by Government counsel, and the institution of any necessary court action. The abstracts were all in the hands of counsel within two months of the acceptance of the options. Nothing in the record indicates that they presented questions of unusual difficulty. Yet, for reasons unexplained in the evidence, the examination of the abstracts of title was not completed until October 1940, more than one year after their delivery to Government

counsel. But it does not follow that because of this delay the appellees were entitled summarily to cancel the option agreements as they attempted to do on the 7th day of January, 1941. Where the vendee in an executory contract for the purchase of land is entitled to a reasonable time for completion of the transaction and steps towards completion have been taken, the vendor can not put an end to the contract without notice to the other party of his intention so to do, after which the party in default has a reasonable time in which to perform his obligations under the contract. Adams v. Rhodes, 143 Ark. 172, 220 S.W. 29; Valley Planing Mill Co. v. Lena Lumber Co., 168 Ark. 1133, 272 S.W. 860, 863; Boswell v. United States, supra. Moreover, the right to abrogate a contract may be waived by continuing to treat it as a subsisting obligation, as the appellees did here, by their insistence upon performance and their willingness to accept it until the date of attempted abrogation. Nelson v. Chicago Mill & Lumber Co., 8 Cir., 76 F.2d 17, 22, 100 A.L.R. 87; Josten Mfg. Co. v. Medical Arts Building Co., 8 Cir., 73 F.2d 259, 260.

█ While wholly ineffective to end summarily the agreement between the parties, appellees' letters of January 7, 1941, must be interpreted, under the facts in this case, as notice of appellees' intention to terminate the agreement because of unreasonable delay. In view of the specific requirement for completion of the transaction by the United States within a reasonable time, contained in the options, these letters, coming as they did after appellees' continued insistence upon performance and the inexcusable delay on the part of the United States for more than one year, were certainly sufficient to bring squarely to the attention of those in charge of the transaction the decision of appellees to rescind the offer to sell unless performance was promptly concluded. In this view of the case, the ultimate question here is whether the United States, after receipt of the notice of cancellation, proceeded within a reasonable time to the completion of the contract. We hold that it did not. The abstracts of title had been examined and defects discovered prohibiting purchase of the land eleven months before the receipt of appellees' notice of cancellation. The United States was under the duty, expressly stipulated in the option agreements, if it wished to proceed with the transaction, to institute promptly condemnation or other legal proceedings. While the delay continued, the value of the land increased to approximately twice what it was at the time of the acceptance of the options, and appellees were denied either the benefit of this increase or the use of the stipulated purchase price, while compelled to pay taxes and carry the risk of loss of or damage to the improvements. Conceding that appellees had waived the right to rescind the options because of delay occurring before the notice of cancellation, the fact of that delay, induced by repeated promises of performance, gave emphasis to the necessity of prompt action thereafter. But seven months elapsed after notice before the complaint in condemnation was filed; two months more passed before appellees heard of it, and another two months before they were served with summons. No evidence was offered by the United States to explain this delay. Unexplained, it was unreasonable as a matter of law. Quinn v. Olsen, supra; Boswell v. United States, supra. Compare Wachovia Bank & Trust Co. v. United States, 4 Cir., 98 F.2d 609.

The judgment of the District Court is affirmed.

WOODROUGH, Circuit Judge (dissenting).

It has seemed to me that Mr. Stott ought to be held bound upon each of the seven written contracts which he admits he solemnly executed and formally delivered to his government. They granted options to the government, which it is admitted the government duly exercised, and by the terms of each one the government agreed to buy and Mr. Stott agreed to convey a described parcel of land for a specified price. I do not find in the record any wrongful action or inaction on the part of the government to justify relieving Mr. Stott from any one of his contracts, and I think the judgment requiring the government to pay nearly double the agreed price for the lands is erroneous.

It is true that Mr. Stott has been constantly "calling on the government for his money" ever since the government exercised its options in 1939, and no money has come into his hands up to this time in 1944, but the two obvious and sufficient reasons appear undisputed—first, that he could not convey certain of the tracts he agreed to convey because he did not have marketable title to them, and, second, that he wilfully re-

fused to perform his agreement to convey those to which he did have such titles.

Each of Mr. Stott's contracts reserved to the government the privilege of condemning the land covered by it "in the event the title to said land is unsatisfactory for the purchase of it by deed", and two of Mr. Stott's titles were found in that condition. But Mr. Stott maintained that he was the true owner of the tracts and he litigated the issue in apparent good faith with those claiming adversely to him in actions in state courts of competent jurisdiction. In respect to the first tract which was found "satisfactory for purchase by deed", Mr. Stott absolutely refused to sign the transfer and voucher documents covering the tract tendered to him, on the ground assigned by him, that he had a contract with the government different from the writings which he signed (to-wit, a single parol contract to sell at $10 an acre.)

The sole ground on which the trial court's judgment excused Mr. Stott from his agreements that his option prices should constitute "final and binding evidence of the true value of said land and of the proper award to be made" in condemnation proceedings, was that the government unreasonably delayed bringing condemnation proceedings.

In entering into option contracts for private property required for government use, the parties hope to avoid federal court litigation of either issues of title or issues of value, and these contracts implement that hope. Doubtless the government could have instituted action against Mr. Stott in respect to his first tract, found satisfactory for purchase, as soon as Mr. Stott refused to make his promised conveyance thereof, but the grounds on which Mr. Stott based his refusal were such as not to extinguish the hope that all the purchases might still be made by deed. The judgment excusing Mr. Stott from his contracts is in no-wise rested upon any asserted breach of obligation of the government to proceed against him at that time. I find no clear definition of the time when it is decided that the government should have instituted court action. It seems clear to me that it was proper for the government to hold off federal court condemnation proceedings against Mr. Stott while Mr. Stott was attempting to establish his titles in the state court litigation. It appears that if Mr. Stott had succeeded in that litigation the hope that prompted the option

contracts would have materialized and federal court litigation would have been avoided. I am not persuaded that either reason or authority made it obligatory on the government to institute its condemnation proceedings a single day earlier than it did institute them. The land titles had to be adjudicated and the judicial process of the state was invoked and was in motion to that end. In that situation, no one should be blamed or held at fault for not starting more court proceedings in another jurisdiction towards the same end, and of course Mr. Stott never requested the government to so cumulate litigation. Mr. Stott's refusal to convey his lands and the delays that inhere in due process of law, have combined to keep Mr. Stott out of his money for a long time, but excepting himself, no one has committed any fault and the government's right to have Mr. Stott held to his contracts ought to be enforced.