**BAILEY SPECIALIZED BUILD-
INGS, INC.**

v.

**The UNITED STATES.**

No. 99–67.

United States Court of Claims.

Dec. 13, 1968.

Theodore M. Kostos, Philadelphia, Pa., attorney of record, for plaintiff.

Edward Weintraub, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND COUNTERCLAIM

SKELTON, Judge.

This is a contract case wherein the plaintiff seeks damages for a breach of contract or an equitable adjustment under the contract resulting from an alleged wrongful termination for default of the contract by the defendant. The defendant asserts a counterclaim growing out of excess costs suffered by it when required to pay an amount above plaintiff's contract price to another contractor who supplied the products involved after plaintiff's contract was terminated by the Government.

The facts involved in this case are substantially as follows:

The plaintiff was engaged in the business of fabrication and erection of steel structures. The defendant awarded firm fixed price Contract No. DA–36–109–ENG–7523 on September 26, 1963, for the fabrication of three unassembled Radome Support Towers at a unit price of $12,400 each or a total contract price of $37,200. These towers will be referred to as production towers. Two of them were to be delivered on August 27, 1964, and the third on September 27, 1964. Each tower was to contain approximately 25,000 pieces of material and would weigh about 30 tons. The towers were to be 25 feet high and 50 feet in diameter and were to be fabricated in accordance with drawings and specifications furnished by defendant's contracting officer. As a part of the contract, it was agreed that the plaintiff would furnish a preproduction model to the defendant for examination and tests. This portion of the contract was stated in the following language:

> As soon as practicable after award of the contract and prior to submission of any units for final acceptance, the contractor shall furnish a preproduction model for examination and test to determine conformance to this purchase description.

On November 1, 1963, the parties agreed that the first production model would be considered to be the preproduction model.[1] The contract contained standard "dispute," "default," and "termination for convenience" clauses. Pertinent portions of the default clause of the contract are as follows:

11. *Default*

(a) The Government may, subject to the provisions of paragraph (c) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:

(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

---

1. The decision of the ASBCA in this case, ASBCA Nos. 10576 and 10633 (66–2 BCA ¶ 6001) shows this agreement to be in the following language:

"3. At a meeting on 1 November 1963, the parties orally agreed that, since only three towers were to be produced, the first production model would be considered to be the preproduction model.

They also agreed that the model would be completely assembled in Bailey's shop, and that it would be inspected for conformance with the purchase description. After the model was approved, it would be disassembled, galvanized, painted, and readied for shipment. * * *" Id. at 27,725.

(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

(b) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, *Provided,* That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.

(c) Except with respect to defaults of subcontractors, the Contractor shall not be liable for any excess costs if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; but in every case the failure to perform must be beyond the control and without the fault or negligence of the Contractor. If the failure to perform is caused by the default of a subcontractor, and if such default arises out of causes beyond the control of both the Contractor and subcontractor, and without the fault or negligence of either of them, the Contractor shall not be liable for any excess costs for failure to perform, unless the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.

\*　　\*　　\*　　\*　　\*　　\*

(e) If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, or that the default was excusable under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause.

\*　　\*　　\*　　\*　　\*

The plaintiff entered upon the performance of the contract and in due time discovered errors in the drawings that had been furnished to it by the Government. This discovery was made after the plaintiff had fabricated a substantial portion of the 75,000 parts which were required for the construction of the towers. The errors were called to the attention of the contracting officer of the defendant and he furnished revised drawings to the plaintiff on August 26, 1964. These revised drawings caused the plaintiff to scrap many parts already fabricated and it was required to remake many of such parts in order to comply with the new drawings. These changes caused serious delay in the production of the required parts. In the meantime, the delivery date for the first two production towers, namely, August 27, 1964, had passed and four weeks later the date of delivery of the third tower had also passed without the plaintiff being able to make delivery. The parties exchanged various letters and had numerous conversations during this period of time and it became clear that the defendant had

waived the original contract delivery dates.[2]

On October 9, 1964, the contracting officer wrote a letter to plaintiff requesting a new delivery schedule. This letter briefly reviewed the history of the dealings between the parties and stated:

Accordingly, you are directed within 14 calendar days after receipt of this letter to present a completely acceptable preproduction model in accordance with Paragraph 3.2 in the purchase description and to furnish evidence of your ability to make delivery of the 3 units within a reasonable time thereafter.

Your failure to comply with the foregoing will result in termination in accordance with Paragraph 11, Default, of the contract.

The plaintiff replied to this letter on October 19, 1964, in which it furnished the requested revised schedule for the inspection of the preproduction model, and also for the delivery of the three production towers in the following language:

Acknowledging your letter of October 9th (received October 14th) we are obliged to amend our shipping schedules on subject contract.

1. Preproduction model of tower will be available for inspection on or before October 28th.

2. Delivery of Tower #1—four weeks from acceptance of above preproduction model.

3. Delivery of Tower #2—five weeks from above acceptance.

4. Delivery of Tower #3—six weeks from above acceptance.

The contracting officer accepted this new schedule proposal of the plaintiff. The preproduction model was submitted to the contracting officer of defendant by plaintiff on October 28, 1964, for his inspection in accordance with the revised schedule contained in plaintiff's letter quoted above. The contracting officer inspected the preproduction model on October 29, 1964, and found 36 defects in it which were orally called to the attention of plaintiff's assistant foreman. The contracting officer did not give the plaintiff any written notice of such defects until January 22, 1965, which was 86 days after the date of inspection and long after the date of the contract was terminated, when he furnished an itemized list of the defects to the plaintiff. No opportunity was given the plaintiff to correct the errors in the preproduction model prior to termination of the contract.

On December 4, 1964, the contracting officer formally advised the plaintiff that its contract was being terminated for default under Article 11(a) (i). The notice of termination stated as follows:

Your failure to make delivery of the items constitutes a default, within the meaning of Article 11(a) (i) of the contract.

The plaintiff alleges that at the time of the termination of the contract, the preproduction tower was 97 percent complete and almost all of the parts for the three production towers were fabricated. The plaintiff says further that the first production tower could have been delivered within 30 days after the inspection and before the date of the termination of the contract if it had received a notice from the defendant of the corrections required on the preproduction model. Plaintiff further says that the objections made by defendant to the preproduction model involved minor defects and that at the time of termination, the plaintiff had substantially complied with the drawings and specifications. These facts were testified to by plaintiff's structural expert at the hearing before the Armed Services Board of Contract Appeals (hereinafter sometimes referred to as "ASBCA" or "Board") which Board found that there was evidence that the defects would require 30 days

2. The ASBCA decision, supra, found this to be true in the following language: "It is very clear that by this time the Government had waived the contract delivery dates. * * * " Id. at 27,724.

for correction, but it rejected evidence that the defects were minor and that the plaintiff had substantially complied with the drawings and specifications.[3]

The plaintiff also says that upon the termination of the contract, the fabricated parts of the production towers could not be used for any purpose whatsoever and that by reason thereof, the plaintiff has suffered a total loss.

The contracting officer further notified the plaintiff that defendant would hold plaintiff responsible for any excess costs incurred as a result of reprocurement of the production towers by the Government.

On January 5, 1964, the defendant awarded a contract for production of the same items covered by plaintiff's terminated contract to Erie Strayer Company, Erie, Pennsylvania, for the sum of $42,375, or an excess cost of $5,175. Demand was made upon the plaintiff by letters dated January 22 and 23, 1965, for payment of this excess cost. The plaintiff appealed the termination for default decision of the contracting officer to the ASBCA in case No. 10576 and also appealed from the excess cost claim of the Government to the same Board in case No. 10633, which cases were consolidated and heard together by the Board. After a hearing, the Board denied plaintiff's appeals and upheld the action of the contracting officer in terminating the plaintiff's contract for default and approving the assessment of the excess cost of $5,175 by the defendant against the plaintiff.

Thereafter, the plaintiff filed the present suit in this court claiming that the defendant had wrongfully terminated his contract and that the action taken by the defendant in this regard should be held by this court to be either a breach of contract or a termination of the contract for the convenience of the Government, and that plaintiff is entitled to

damages or an equitable adjustment under the contract for the added costs incurred.

The defendant has answered plaintiff's suit alleging as an affirmative defense that plaintiff's claims were based upon questions of fact which were resolved in favor of the defendant by the ASBCA and that under the disputes article in the subject contract and the Wunderlich Act, 41 U.S.C. § 321, the decision of the ASBCA is final and binding on the plaintiff and on this court. The defendant also asserts its counterclaim against the plaintiff in the sum of $5,175, which it alleges has been found to be correct by the ASBCA. It says this finding is in no way arbitrary or capricious and is final and binding on the plaintiff and on this court.

Both parties have moved for summary judgment and defendant also asks for judgment on its counterclaim. The case is now before us on these motions.

■■ There is no doubt that by the time defendant wrote the letter to plaintiff on October 9, 1964, requesting a new delivery schedule, the defendant had waived the contract delivery dates, and the Board so found. Under these circumstances, the defendant was required to agree with plaintiff on a new delivery schedule or give the plaintiff notice of a new delivery schedule which would be reasonable as to time. See Boswell v. United States, 123 F.2d 213 (5th Cir. 1941); and United States v. Stott et ux., 140 F.2d 941 (8th Cir. 1944). By writing the letter, it appears that defendant was attempting to reach an agreement with the plaintiff on a new delivery schedule. The plaintiff answered this letter by its letter of October 19, 1964, in which it proposed a new schedule as set forth in the letter. The defendant accepted the new schedule.[4]

■ The acceptance by defendant of the new schedule proposed by the plain-

3. See p. 27,726 of the ASBCA decision, supra.

4. The board found " * * * There is no doubt that the contracting officer

accepted this proposal, and no claim is made that the time proposed was not reasonable in the circumstances. * * *" See ASBCA Decision. Id. at 27,725.

tiff constituted an amendment to the contract between the parties and the delivery dates in the original contract passed out of the picture. In view of this new agreement, plaintiff was obligated only to make delivery of the production towers in accordance with the new schedule. This schedule required it to submit a preproduction model *for inspection* on or before October 28, 1964. It will be noted that the preproduction model was only to be available for inspection on that date and there was no requirement that it be delivered at that time. The delivery of tower No. 1 was to be made four weeks from the *acceptance* of the preproduction model; tower No. 2, five weeks after its acceptance; and tower No. 3, six weeks after its acceptance. The acceptance by defendant of the preproduction model was a condition precedent to the delivery of the three towers, and the time for the delivery of the three towers did not start to run until after the acceptance of the preproduction model. This is true notwithstanding the fact that the parties agreed that the preproduction model would be the first production model, as stated above. Even though the first production model was to be the preproduction model, it was not due to be delivered under the new schedule until four weeks after the acceptance by defendant of the preproduction model.

The plaintiff furnished the preproduction model to defendant on October 28, 1964, in accordance with the new schedule. This was all that plaintiff was required to do. The defendant inspected it and found thirty-six alleged defects in it, which it pointed out orally to plaintiff's assistant foreman. The defendant neither rejected nor approved the model. It might be said that defendant's conduct amounted to a rejection of the model even though no written notice was given by it to that effect at the time. But, in any event, the model was not approved. On the date of the inspection, the defendant could either approve the model and thereby start the time to running within which plaintiff would have to deliver the first production tower, or it

could give plaintiff ten days' written notice of default with an opportunity to cure the default as provided in paragraph 11(a) (ii) of the contract, supra. Defendant did neither, but proceeded to terminate the contract by sending plaintiff a written notice on December 4, 1964, stating:

> Your failure to make delivery of the items constitutes a default, within the meaning of Article 11(a) (i) of the contract.

An examination of the contract reveals that Article 11(a) (i) authorizes the Government to terminate the contract "[I]f the contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof."

The defendant took the position that the failure of plaintiff's preproduction model to pass inspection and be approved by defendant on October 28, 1964, gave it the right to terminate the contract under this provision of the agreement. We do not agree. The new schedule set forth in plaintiff's letter of October 19, 1964, which was accepted by defendant, did not require plaintiff to deliver any of the production towers on October 28 when the preproduction model was to be submitted for inspection. All that plaintiff was required to do on that date was to submit the preproduction tower to defendant for inspection. The plaintiff complied with this obligation. No production tower was required to be delivered until four weeks after defendant accepted the preproduction model. The defendant terminated the contract without ever having accepted the preproduction model. We think plaintiff did everything it was required to do by the new schedule, although its model was not approved.

■ It is our opinion that defendant misinterpreted the meaning of Article 11(a) (i) of the contract, and that the ASBCA fell into the same error. The interpretation of the meaning of a contract is a question of law to be determined by the court, and the court is not bound by a decision of the Board with respect thereto. Sundstrand Turbo v.

United States, 389 F.2d 406, 411, 182 Ct.Cl. 31, 40 (1968); Perini Corp. v. United States, 381 F.2d 403, 409, 180 Ct.Cl. 768, 777–778 (1967).

The defendant and the Board have interpreted this provision of the contract as requiring the plaintiff to *deliver* a production model on October 28, 1964, the date the preproduction model was submitted for inspection, and, if plaintiff failed to do so, defendant could, without any advance notice, cancel the contract by written notice of default under this provision. The Board itself has otherwise interpreted this provision in the contract in other cases decided by it. For instance, in the case of Phipps Products Corp., ASBCA No. 937 (decided September 26, 1952) the Board construed Article 11(a) (i) in the following statement:

> The general "Default" provision (Art. 11) of the contract describes two sets of circumstances as conditions under which the Government is given the authority to wholly or in part terminate this supply contract. The first, as set forth in subparagraph (a) (i) thereof would exist if and when the appellant failed to make delivery of the end product within the time specified, * * *. Id. at 11.

In the case of Dubrow Electronics Indus., Inc., ASBCA No. 8464 (1965), (65–1 BCA ¶ 4859) the Board interpreted the meaning of both default clauses by saying:

> Paragraph (a) of the "Default" clause expresses a general intent to give the Government a *right*, under subparagraph (i), to terminate for de-

fault without any advance notice when the default consists of a failure to meet the contract due date as to end items, whether supplies or services, but, under subparagraph (ii), to entitle the contractor to a ten-day notice and opportunity to cure the default as a condition precedent to any right of the Government to terminate for default for any other type of default, including a failure to meet a specified progress milestone. * * * Id. at 23,004.[5]

As pointed out above, the interpretation of a contract is a question of law to be determined by the court. If a Board makes an interpretation of this kind, we are not bound by it, but we may approve it and let it stand if we find it to be correct. We think the Boards did correctly construe the default clauses in the contracts involved in the last two cited cases, which are the same clauses as those involved in the instant case.[6]

Article 11(a) (i) gives the Government the right to terminate the contract without any advance notice if the contractor fails to (1) make delivery of the supplies, or (2) perform services, within the time specified. In our case, the contractor did not fail in either respect. The requirement "to make delivery of the supplies" refers to delivery of the production towers or "end items." None was required to be delivered at the time of the inspection of the model on October 28, 1964. Their delivery was not due until four, five, and six weeks, respectively, after the acceptance of the model. It is concluded that this provision of the contract was not violated.

---

5. See also, Midwest Eng'r. & Constr. Co., Inc., ASBCA No. 5801, 1962 BCA ¶ 3289.

6. This construction is in accord with the Government's official interpretation of Article 11(a) (i) and (ii) as set forth in ASPR 8–602.3, 4 CCH 1968 Gov't. Contract Rep. ¶ 33,995.15(c), which provides:
   "If, * * * the PCO determines that termination for default is proper, he shall, where the termination is predicated upon the contractor's failure to make timely deliveries, issue a *notice* of termination at once— * * *. If the termination is predicated upon any other failure of the contractor, the PCO * * * shall give the contractor written notice specifying such failure and providing a period of 10 days (or such longer period as the PCO may authorize) in which the toure such failure. * * * Upon expiration of the 10 days (or longer period), the PCO— * * *, may issue a notice of termination for default unless he determines that the failure to perform has been cured. * * * "

If the requirement "to perform services" has any relevancy to the date of the inspection of the model, it could only apply to the obligation of plaintiff to submit a model for inspection on October 28, 1964, and the services involved in doing so. This was fully complied with by plaintiff. However, it should be noted that this is a standard clause in general use in Government contracts and generally refers to situations where work is to be performed or services furnished as the end item instead of the delivery of supplies as end items. In either case, it was not violated by plaintiff here.

The Board erroneously interpreted the new agreement as to delivery dates to require the plaintiff to *deliver* the preproduction model as the first production tower on October 28, 1964, the date of its inspection. We have already pointed out that no delivery was required on that date. Nevertheless, the Board concluded that the agreement called for plaintiff to make delivery on that date, and having failed to do so, the Government had the right to terminate the contract under Article 11(a) (i) without any advance written notice to plaintiff. The Board said in its opinion:

> * * * The appellant thus loses the cornerstone of its case that no time for performance had been established so as to justify a termination for default under Article 11(a) (i) especially with respect to a preproduction model. Id. at 27,725.

Again, in discussing Dubrow Electronics Indus., Inc., supra, cited to the Board by plaintiff, the Board said it was not in point, stating:

> * * * [B]ut it is cited only in support of the point that the Government erroneously terminated the contract under paragraph (a) (i) of the default article when, as assumed, the preproduction model was not subject to a specified delivery requirement. We have characterized this assumption as the cornerstone of the appellant's case.

We said in *Dubrow*, * * * we do not regard the preproduction model as an end item, in view of the provisions that it was not to be delivered * * * under the contract without being reworked after completion of preproduction testing. This was not the situation in the case before us. * * * Id. at 27,727.

We think the situation in our case that no delivery of the model was required on its inspection date was similar to the situation (although for different reasons) that existed in the *Dubrow* case. The model was not required to be delivered in either case on the inspection date. The Board erred in construing the agreement in our case as requiring such a delivery, and also erred in its application of the decision in the *Dubrow* case to the contract here.

■ It is clear that if the Government was to terminate the contract for default, it could not do so under paragraph (a) (i) of Article 11, but would have to resort to paragraph (a) (ii) thereof. That paragraph gives the Government the right to terminate the contract if the contractor fails to perform any of the other provisions of the contract (i. e., other than those specified in paragraph (a) (i)) or so fails to make progress as to endanger performance of the contract in accordance with its terms. If the Government proceeds under this paragraph, it must give the contractor ten days advance written notice of its intention to terminate, specifying the failure of the contractor. If the contractor does not cure the defects within the ten day period (or such longer period as the contractor may authorize in writing), the contract may be terminated.[7]

■ The Government did not give the plaintiff the ten days' written notice of the defects. Consequently, plaintiff had no opportunity to correct them. The Board held that no such notice was required.[8] It also held that the oral state-

7. Sol O. Schlesinger v. United States, 390 F.2d 702, 704, 182 Ct.Cl. 571, 576, (1968).

8. ASBCA Decision. Id. at 27,727.

ments of the Government's inspector to the plaintiff's assistant foreman as to the defects in the model satisfied the requirements of the contract as to notice.[9] We think the Board was wrong on both counts. The contract called for a written notice, and, under the circumstances of this case, oral notice was not sufficient. United States v. Cunningham, 75 U.S. App.D.C. 95, 125 F.2d 28 (1941). The purpose of the written notice requirement was to give the plaintiff an opportunity to correct the defects. This was not done. The Government did not give the plaintiff a written list of the defects in the preproduction model until January 22, 1965, eighty-six days after the inspection and after it had terminated the contract on December 4, 1964.

The defendant argues that the Board found that it would have taken 30 days for the plaintiff to have corrected the defects and the ten days' notice would not have been of any benefit to plaintiff. This is hindsight speculation. The contract required the defendant to give the notice if it wished to terminate the contract under this paragraph. The ability of the plaintiff to cure the defects within the ten day period was an entirely different question and was the problem of the plaintiff. It may be that by accelerating the work, plaintiff could have cured the defects in ten days. In any event, it was entitled to the opportunity to do so. The obligation of the defendant to give the notice was fixed by the contract.

■ It is concluded that the termination of the contract by defendant without giving the plaintiff the ten days' written notice as required by Article 11(a) (i) of the contract constituted a wrongful termination of the contract by the defendant. This brings us to the consideration of the question of the remedy available to the plaintiff because of this termination of the contract. Subparagraph (e) of Article 11 of the contract provides that where there is a wrongful termination of the contract by the defendant, if the contract contains a termination for

convenience of the Government clause, and the contractor is not in default, the rights and obligations of the parties shall be the same as if the notice of termination had been issued pursuant to such clause. The contract here contains such a termination for convenience clause. It is concluded, therefore, that the termination of the contract must be treated as a termination for the convenience of the Government and not a breach of contract. Plaintiff is entitled to an equitable adjustment in accordance with the termination for convenience clause. See John Reiner & Co. v. United States, 325 F.2d 438, 163 Ct.Cl. 381 (1963), cert. denied, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964); Sol O. Schlesinger v. United States, supra, and cases therein cited. The determination of the plaintiff's recovery must be made by the ASBCA in further proceedings before it, because the termination for convenience arose under the contract.

■ The Government has asserted a counterclaim against plaintiff in the sum of $5,175 under Article 11(e) of the contract representing excess costs which it incurred in procuring the three production towers from another contractor after it terminated plaintiff's contract. This provision in the contract makes the contractor liable for such excess costs if the Government terminates the contract *as provided* in Article 11(a) (i) or (ii). We have already concluded above that the Government did not terminate the contract in accordance with such Article, but that its termination was wrongful. Under these circumstances, the plaintiff is not liable for the excess costs and defendant's counterclaim must be denied. See Williams v. United States, 26 Ct.Cl. 132 (1891); Burton Coal Co. v. United States, 60 Ct.Cl. 294, 312 (1925), aff'd, 273 U.S. 337, 47 S.Ct. 351, 71 L.Ed. 670 (1927); Stone, Sand & Gravel Co. v. United States, 234 U.S. 270, 34 S.Ct. 865, 58 L.Ed. 1308 (1914).

We hold that plaintiff is entitled to recover and judgment is entered granting

9. ASBCA Decision. Id. at 27,727.

its motion for summary judgment on the issue of liability. Further action in this court will be suspended for six months from this date to allow the parties to return to the ASBCA for a determination of the amount, if any, to which plaintiff would have been entitled if its contract had been terminated pursuant to the termination for convenience of the Government article in the contract. Plaintiff shall comply with Rule 100 and the General Order of the court of April 1, 1968. Upon the conclusion of the proceedings of the ASBCA, the plaintiff will report the result to the court and the parties will take further action of the final disposition of the case in this court. The defendant's cross motion for summary judgment and its counterclaim are denied and dismissed.