**KISCO COMPANY, INC.**

v.

**The UNITED STATES.**

**No. 338–77.**

United States Court of Claims.

Nov. 14, 1979.

Samuel C. Ebling, St. Louis, Mo., attorney of record, for plaintiff.

Lynn J. Bush, Alexandria, Va., with whom was Acting Asst. Atty. Gen. Alice Daniel, Washington, D.C., for defendant.

Before DAVIS, NICHOLS and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on plaintiff's motion, filed September 6, 1979, requesting that the court adopt, as the basis for its judgment in this case, the recommended decision of Trial Judge Robert J. Yock, filed June 25, 1979, pursuant to Rule 166(c) on the parties' cross-motions for summary judgment, defendant, on August 15, 1979, having notified the court that it does not intend to seek review by the court of the trial judge's recommended decision. Upon consideration thereof, without oral argument, since the court agrees with the said decision, as hereinafter set forth, it hereby grants plaintiff's motion and adopts the decision as the basis for its judgment in this case.

Accordingly, plaintiff's motion for summary judgment as to liability under Count I of the petition is granted and as to it the case is remanded to the Secretary of Labor for determination of the amount of recovery under clause 13 of the contract. Further proceedings before this court will be stayed for a period of six (6) months from the date hereof, with defendant's counsel designated to advise the court by letter to the trial judge of the status of the remand proceedings pursuant to Rule 149(f). Attention of counsel and the Secretary is also directed to Rule 150. Plaintiff's motion for a *de novo* trial as to Count II of the petition is denied. Defendant's cross-motion for summary judgment is denied as to Count I and granted as to Count II of the petition with Count II of the petition, accordingly, dismissed.

**744**

## OPINION OF THE TRIAL JUDGE

YOCK, *Trial Judge:* This contract dispute involves an appeal from the final decision of the Secretary of Labor, which adopted and affirmed the decision of the Department of Labor, Board of Contract Appeals (hereinafter the Board).[1] The contracting officer had attempted to partially cancel (terminate) the contract for default in April 1970, and to cancel the remaining portion of the contract for default in December 1970. The Board, however, found the cancellations for default to be invalid, but denied any recovery to the plaintiff on the grounds that the parties had agreed to a bilateral modification of the contract. In Count I of its petition, plaintiff seeks review under the well-known standards of the Wunderlich Act, 41 U.S.C. §§ 321–22; in this respect, plaintiff seeks recovery based on the termination for convenience clause of the contract. In Count II of its petition, plaintiff seeks a *de novo* trial to recover appropriate damages as a result of the Government's alleged breach of its contractual obligations.

In its cross-motion for summary judgment, defendant, in Count I, requests the court to sustain the Secretary of Labor's decision. Defendant seeks dismissal of plaintiff's claim contained in Count II.

For the reasons set forth below, it is concluded that plaintiff's motion for summary judgment under Count I should be granted. It is further concluded that plaintiff's motion for a *de novo* trial under Count II should be denied.

### Background

The facts found by the Board or otherwise justified by the administrative record[2] are hereafter set forth.

The plaintiff in this action was a small manufacturing company organized under the laws of the State of Missouri. Its plant was located near the heart of the "hard core

unemployed" geographical area of St. Louis, Missouri. It employed approximately 900 people at this plant and was a supplier of cartridge cases and ammunition boxes for the United States Armed Forces.

The MA–4 contract involved was the result of an MA–4 jobs proposal submitted to the United States Department of Labor by plaintiff on April 17, 1969. That proposal, after further negotiation, was approved by the U.S. Department of Labor Manpower Administration, and the parties entered into Contract No. 27–9–4040–000, with an effective date of May 5, 1969, and an expiration date of May 4, 1971. The basic authority for a job contract of this type was contained in the Manpower Development and Training Act of 1962, 42 U.S.C. §§ 2571, *et seq.*

Under the contract, Kisco was to hire 175 eligible disadvantaged persons over the course of the 2-year contract at the hiring rate of 25 employees every 2 months, commencing with June of 1969. The eligible disadvantaged persons were to be employed in entry-level positions in 14 specified occupations. The entry-level positions included that of maintenance helper, assembler, industrial truck operator, painter, spot welder, punch-press operator, shear operator, seam welder, rivet machine operator, production line welder, inspector, maintenance man, press operator, and tool machine setup man.

The contractor was to provide the MA–4 employees with on-the-job training and certain supportive services as specified in the contractor's proposal and incorporated into the contract. These support services included initial orientation and counseling, basic classroom education (seventh grade reading level and eighth grade mathematics level), special counseling and job coaching, medical and dental services, and transportation services. In addition, Kisco agreed to provide certain training for its supervisory

---

1. *Kisco Company, Inc.,* BCAL–10 of Nov. 24, 1972, affirmed by the Secretary of Labor on May 21, 1973.

2. *See Merritt-Chapman & Scott Corp. v. United States,* 528 F.2d 1392, 1398, 208 Ct.Cl. 639, 651 (1976); *Arundel Corp. v. United States,* 515 F.2d 1116, 1118 n.3, 207 Ct.Cl. 84, 89 n.3 (1975).

personnel in human relations so that its supervisors would better understand the problems of a disadvantaged employee. The training periods for the various occupational positions ranged from approximately 17 weeks for a maintenance helper to a high of 44 weeks for a tool machine setup man.

The contract also provided that a Mr. Donald N. Humphries would be primarily responsible for performance of the contract. Mr. Humphries was a subcontractor for Kisco with respect to this contract and had initially encouraged Kisco to apply for a manpower training (jobs) contract. He was involved in preparing the contract proposal for Kisco. He also set up and initially coordinated the program. His services were eventually terminated by Kisco on March 13, 1970 (effective April 13, 1970).

This was a fixed unit price contract, and the unit by which payment was calculated was a day of employment and training for one certifiedly disadvantaged trainee. The amount of payment for each unit depended upon the number, duration, and estimated cost of the various supportive services and upon the duration and cost of the on-the-job training. The contractor was entitled to substitute for terminated employees subject to the payment term; however, the total cost of the contract was not to exceed $408,450. The payment term of the contract provided:

1. *Payment.*—a. Contractor shall submit certified monthly invoices. Payment shall be based on the total days for which wages were paid under each job title times the fixed unit cost per employee per day within that job title. In no event shall total payments exceed the contract amount, nor shall total payments within a job title exceed the maximum amount for that job title nor shall payments for an employee within a job title exceed the fixed unit cost per employee within that job title; said amounts specified elsewhere in this contract. Cumulative payments for a terminated employee and any substitutes therefor shall not exceed the applicable fixed unit cost per employee.

b. In the event an employee terminates for death, incarceration, permanent disability, illness, return to school, military service or acceptance of a job with another employer at a higher rate of pay, the Contractor, upon demonstration of same, shall be paid for all days for which wages were paid up to the date of termination of the employee at the daily fixed unit cost plus 25% of that amount. Such payment is to be computed to the nearest daily multiple. However, in no event may the total fixed unit cost per employee per job title be exceeded.

c. No payment shall be made for work performed after the contract completion date or a period of two years from effective date of this contract.

d. Contractor shall maintain records sufficient to support all payments and upon request of the Contracting Officer shall make such records available to the Government.

Other relevant contract clauses provided for cancellation for default, for terminations for the convenience of the Government, and for termination of employees for disciplinary reasons. Clause 9 of the contract terms provided for cancellations as follows:

9. *Cancellation.*—If Contractor fails to perform under this contract or fails to make sufficient progress so as to endanger performance, the Contracting Officer may cancel the contract, in whole or in part, upon written notice to the Contractor and his failure to remedy such condition within 10 days of receipt of such notice. In the event of such cancellation, Contractor will be paid to the date of cancellation for each employee hereunder in accordance with the Payment Term. Should it finally be determined that the Contractor has in fact performed properly, then the cancellation will be treated as a termination for convenience.

Clause 11 provided that the contractor could terminate employees for disciplinary reasons and substitute therefore as follows:

11. *Termination of Employees.*—Termination of employees does not require

Government approval. The Contractor's rights to discipline, suspend or discharge employees shall be in accordance with the Contractor's established rules and regulations and with any applicable collective bargaining agreement. Substitution for terminated employees is permissable [sic].

Clause 13 of the contract terms provided for terminations for convenience as follows:

13. *Termination for Convenience of the Government.*—The Contracting Officer by written notice, may terminate the contract, in whole or in part, when it is in the best interest of the Government. In such event, the Contractor shall receive as full payment, for the jobs or job titles terminated, the daily unit cost for all days for which wages were paid prior to termination, plus 25% of that amount. Such payment is to be computed to the nearest daily multiple. In lieu of such payment, Contractor by written notice to the Contracting Officer, may elect to be governed by the provisions of the Termination Clause contained in 41 CFR 1–8.-704–1, which clause is incorporated herein by reference, with any determination of costs under paragraph (c) thereof to be governed by the cost principles contained in 41 CFR 1–15.2, all as in effect on the date of this contract. However, in no event shall any of said payments herein exceed the maximum fixed unit cost for said jobs or job titles terminated.

The contract also included a standard disputes clause. There were no changes or suspension of work clauses in the contract.

On May 27, 1969, Mr. Charles F. Daum, an employee of the U.S. Department of Labor Manpower Administration (hereafter DOL) first visited the Kisco plant. After discussions were held with Mr. Humphries and a Mr. Norman Davis, a Kisco training officer, Mr. Daum reported that the formal training of the MA–4 trainees would start on June 2, 1969, that 15 trainees had been tentatively hired, that the training staff was enthusiastic and hopeful of conducting a productive program, and that supportive services appeared to be well planned.

On October 17, 1969, the DOL paid its second visit to the Kisco plant since the contract had been signed. On that date, Mr. Joseph W. Quinlan, a manpower development specialist with DOL assigned to monitor the Kisco contract, met with Mr. Humphries and Mr. Donald Schicker, Director of Industrial Relations for Kisco. His report of that visit indicated that as of September 30, 1969, there had been 173 trainees employed, 72 were still employed, and 101 had already terminated employment. He noted that this large turnover was due to a wildcat strike by about 35 MA–4 trainees after a training instructor had been replaced. Twenty-three trainees quit after this incident. He noted further that the trainee turnover rate, other than for this one incident, was much less than the normal plant turnover for regular employees. His concluding recommendations were that the contract required no change, and that no additional services were required.

On February 10, 1970, Mr. Quinlan paid his second monitoring visit to the Kisco plant. He met with three Kisco job counselors and Mr. Leon Lovelace, Kisco's training supervisor, representing Mr. Humphries. His report of that visit indicated that as of December 31, 1969, 306 trainees had been employed, 90 were still employed and 216 had already terminated employment. He learned at that time that the plant had been shut down on December 30, 1969, by management in an effort to correct a ballistic rejection of the cartridge shell casings that were being manufactured by Kisco for the U. S. Armed Forces. The entire production force (including the 90 trainees) was out of work during this 30–40 day period. As of the February 10 visit date, Kisco had resolved its problems and had started recalling the workers, including the MA–4 trainees. He noted further that the turnover rate showed no improvement; for example, 42 trainees were hired in December, but 36 had terminated. He indicated the primary reason for the turnover problem was the lack of sensitivity training for the first line supervisors. Also, he felt that Kisco was using the program to build

up a surplus labor pool. His concluding recommendations were that the contract required no change, but a further visit should be made when the plant and school (training) were back in full operation.

On March 19, 1970, Mr. Quinlan made his third monitoring visit to the Kisco plant. At that time, he met only with Mr. Lovelace, but he did return the next day to discuss with Mr. Schicker corrective measures that could be taken to make the program successful. His report of the visit (dated March 19, 1970) indicated that while 39 percent of the days had elapsed since the contract's formation, only 16 percent of the aggregate trainee days had been worked, and only 17 percent of the reimbursement had been earned. His observation and appraisal was that the hiring schedule was not being met due to excessive turnover. The report further outlined the significant problem areas as follows:

This visit was primarily made to check progress records and training records of all trainees. Because of the incompleteness of records a valid evaluation was not possible. The program seems to be in all phases a complete failure. There are 175 authorized slots, there have been 316 hires, 271 terminations, no completions, and only 45 slots are presently filled. The sub-contractor [sic], Humphries and associates has been terminated by the Kisco Company. There are no supported services available to the trainees at this time. For the past four months the turnover rate has been way above average and seemed to occur during the OJT phase of the program. It appears the first line supervision were not given the proper sensitivity training, or were so production minded, they did not allow any consideration for the type of trainees involved in this program. * * *

Mr. Quinlan concluded that the contract should be terminated. However, he also recommended that further service or assistance should be provided with follow-up visits as follows:

1. Complete re-evaluation of the program and make modifications in cate-gories necessary to make it a more realistic program.
   (a) Number of slots to be reduced from 175 to 45 which are presently on board (also reevaluate occupations)
   (b) Reduce the money amount of the contract to the amount needed to re-emburse [sic] the 45 slots on a no replacement bases [sic].

2. Company to hire own counselors for their support services (which at present time is not available to trainees) (counseling should be given in greater depth).

3. Company to keep complete records on premises on all trainees for future reference. (Records at present are very incomplete).

These recommendations were not communicated to Kisco.

At the hearing, plaintiff presented substantially unrebutted evidence that there were support services being offered at the time of the visit, that sensitivity training had, in fact, been given many of the supervisors, and that sufficient records were available to make appropriate evaluations possible.

At the expiration of Kisco's collective bargaining contract on March 29, 1970, a strike began which idled the work force (including the trainees on board) and which lasted until April 26, 1970.

On April 7, 1970, the contracting officer sent to Kisco the following letter purporting to be a notice of partial termination for default:

April 7, 1970

7 MGBC

MA–4 Contract No. 27–9–4040–000

Kisco Company, Incorporated

6300 St. Louis Avenue

St. Louis, Missouri 63121

The U.S. Government hereby partially terminates your MA–4 Contract No. 27–9–4040–000 effective April 10, 1970, as performance has been unsatisfactory due to excessive turnover of trainees. This partial termination is in accordance with the terms of the contract, Clause 9.

You shall not start any new hires under this contract or place any orders in connection with the contract until a satisfactory modification is agreed upon as a result of renegotiation.

Please advise this office as soon as the strike is settled so that immediate renegotiation of the contract can be effected.

Neal B. Hadsell

Contracting Officer

On April 30, 1970, Mr. Schicker responded by letter to the above notice by informing Mr. Quinlan that the strike had ended and that they were recalling employees for work.

Mr. Quinlan then paid his fourth visit to the Kisco plant on May 11, 1970 and met with Mr. Schicker. His report indicated that as of March 31, 1970, 47 percent of the contract time had elapsed and 18 percent of the trainee days and reimbursement had been worked and earned. Kisco had hired 346 trainees, 285 had terminated, and 61 were still employed. The report indicated that the hiring schedule was not being met due to the strike, new supporting services were needed, and the records were still not complete. He further noted that the contract was suspended during the strike, that the sponsor was going to propose a modification to the program, and that there would be a partial de-obligation of money. He recommended that the modified proposal be reviewed by June 1, 1970, to get the new program in operation. His final recommendation was that the program should be modified to reflect the trainees on board.

There then followed a series of meetings and correspondence back and forth between Kisco and the DOL, for the purpose of working out a modification of the existing contract. Throughout this 6-month period of time, it was clear that the DOL had a strong and continuing interest in scaling the contract down so that funds not available to Kisco could be reprogrammed to other or additional DOL manpower job contracts. If a formal modification or termination of the contract did not or had not taken place, the unused available funds would be returned to the U.S. Treasury, and become unavailable to the DOL for reprogramming. The contractor, on the other hand, wanted to make sure that any restructuring of its contract would still be a workable and profitable one for it. At a meeting on June 17, 1970, Mr. Schicker indicated that the company had lost approximately $30,000 on the contract. He felt a new program would have to have 60–65 trainees in it to make it workable. He also expressed a desire to accelerate reimbursements. In addition, DOL informed him of Kisco's right to receive certain funds pursuant to the 25 percent special billing provisions (Payment Clause 1(b)) of the contract. The meeting ended with no modification agreed to and with both parties agreeing to come forward with certain information. Kisco would provide cost information on job categories to be restructured and DOL would provide information as to accelerated reimbursements.

After several telephone conversations, the parties again met on August 12, 1970, at the Kisco plant. This time, Mr. Quinlan and a Mr. Arthur Wilmoth (DOL) had brought a sample modification proposal form taken from a similar contract to use as a guide for the parties. They informed Schicker that there could be no accelerated reimbursements under the existing contract and that DOL wanted the modification to reflect only those trainees (35) and trainee categories that were still employed by Kisco. At the meeting there apparently was still some confusion between the parties about how to fill the modification proposal request out and, in fact, a modification was not agreed to at that meeting either. Schicker, at the meeting, handed one of the DOL employees the names of the individuals on which he intended to file a special billing claim. DOL agreed to get back on the mechanics of filling out the modification form. Approximately 1 month later, new modification forms were sent to Mr. Schicker.

Sometime in early September, 1970, Kisco submitted its formal claim for special billing.

On October 8, 1970, Mr. Griffin (DOL) wrote to Kisco advising that it had to present further information to substantiate the reasons for termination of the listed employees in order for the special billing claim to be paid.

Further correspondence indicates that Kisco was attempting to gather this information when Mr. Griffin (DOL) sent Kisco on November 9, 1970 its notice of default letter, pertinent parts of which read as follows:

> This will advise you that, as Contracting Officer, I intend to cancel this Contract within 10 days of your receipt of this notice if you fail to remedy the conditions outlined below. Certain of the substantial failures of contract performance revealed by this review are indicated below. You were requested in our letter of October 8, 1970 to submit demonstration of your eligibility for a special billing as provided in Article 1, Paragraph b of the Contract Terms. If you fail to submit to the satisfaction of myself, as Contracting Officer, within 10 days the above mentioned billing accompanied by the required support information, I intend to cancel said contract.

The November 9, 1970 letter was followed by a standard "letter of termination" notice on December 2, 1970. This letter ordered the contractor to cease all performance under the contract and refrain from incurring any costs chargeable against the contract. The letter, which purported to be essentially equivalent to a termination for default, referenced the disputes clause and specifically apprised the contractor of its rights to appeal the cancellation within 30 days.

On December 30, 1970, plaintiff timely appealed to the Secretary of Labor from the contracting officer's December 2, 1970 decision to cancel the contract. Kisco also at that time asserted an affirmative claim in the amount of $181,960 for alleged breach of contract.

After an extensive hearing on the plaintiff's claims, the Board (and Secretary) concluded that the April 7, 1970 letter was invalid as a partial termination (cancellation) for default. However, the Board did feel that the letter did set in motion a sequence of events which resulted in a bilateral modification to the contract. The Board found that by September 30, 1970, all trainees had either concluded their training or had been terminated. Also, the Government had paid Kisco for all the work performed to September 30, 1970, with the exception of certain special billings.[3] Therefore, the Board concluded that Kisco had fully performed to the satisfaction of the Government and nothing in the contract remained to be terminated (cancelled). The Secretary agreed with the Board that the cancellation for default of December 2, 1970 was a "null and void" act. The Secretary further stated that he did not consider and decide the breach of contract claim because it was outside his disputes clause jurisdiction.

Thereafter, plaintiff brought the present action in this court.

### Discussion

### Count I

■ In Count I of its petition, plaintiff requests this court to reverse the final decision of the Secretary of Labor and enter a judgment in its favor. It argues that the Secretary should have found that its MA–4 jobs contract was partially terminated for the convenience of the Government by the Government's April 7, 1970 default termination notice, and finally terminated for the convenience of the Government by the Government's default termination notice of December 2, 1970. Plaintiff contends that it was entitled, therefore, to receive as full payment, for the jobs or job titles terminated, the daily unit cost for all days for which wages were paid prior to termination, plus

---

**3.** The Secretary affirmed the Board's denial of the special billing claim under clause 1(b) of the contract, because the contractor had failed to substantiate entitlement. The special billing claim is not at issue in this proceeding, except insofar as it formed the Government's justification for defaulting the contractor on December 2, 1970.

25 percent of that amount, pursuant to clause 13 of the contract. Because this court basically agrees with the plaintiff's contentions in this regard, the Secretary's decision is hereby reversed.

It is the duty of this court to determine, under the standards of the Wunderlich Act, 41 U.S.C. §§ 321–22 (1970), whether the administrative findings of fact and conclusions of law are supported by substantial evidence and are correct as a matter of law.

A. *The Improper Partial Default Termination.*

The Board was of the opinion that the notice of April 7, 1970 was ineffective as a notice of partial termination for default. However, the Board was of the view that the notice of April 7, 1970 set into motion a whole sequence of events culminating in a bilateral modification of the MA–4 jobs contract, which considerably reduced the scope of the contract, and precluded any recovery under the termination for convenience clause (clause 13) of the contract. For the reasons outlined below, the conclusions of the Board (which were subsequently adopted and affirmed by the Secretary of Labor) regarding the effect of this notice cannot stand. The circumstances of this case compel the conclusion that the notice of April 7, 1970, while ineffective to partially terminate the contract for default, must be treated as giving rise to a partial termination for the convenience of the Government.

The notice of April 7, 1970, purported to be a "partial termination * * * in accordance with the terms of the contract, Clause 9." It advised the contractor not to "start any new hires under [the] contract or place any orders in connection with the contract until a satisfactory modification [was] agreed upon as a result of renegotia-

tion." The Board held and the Secretary affirmed, that the notice of April 7, 1970, was ineffective as a notice of partial termination for default (cancellation) "because it was not preceded by the 10-day cure letter [and] because it failed to comply with the minimum requirements of a final notice as contained in the Federal Procurement Regulations."

When reviewing cases of this kind, this court must always look to the terms of the contract, the applicable regulations, and the appropriate case precedent. *See Dairy Sales Corporation v. United States,* 593 F.2d 1002, 1005, 219 Ct.Cl. ——, —— (1979).

In general, default terminations, as a species of forfeitures, are to be strictly construed. *DeVito v. United States,* 413 F.2d 1147, 1153, 188 Ct.Cl. 979, 990 (1969). As the court indicated in *Dynalectron Corp. v. United States,* 518 F.2d 594, 602, 207 Ct.Cl. 349, 364 (1975):

A default termination is the Government's way of telling its contractor that he has breached the contract. In a default termination, the Government assumes the risk of having the default termination converted to a convenience determination if the Government is wrong and the contract so provides, as here.

Clause 9 of the contract (and also the Federal Procurement Regulations)[4] requires that a written notice allowing a 10-day opportunity to cure precede any final termination for default notice. The Board found that the present notice of April 7, 1970 stated by its own terms that the contract would be partially terminated, effective April 10, 1970. There likewise was no indication in the notice at all that plaintiff would have an opportunity to cure prior to any final notice of partial termination (can-

4. The Department of Labor's procurements are generally covered by the Federal Procurement Regulations, set out in 41 C.F.R. § 1 (1969). 41 C.F.R. § 1–8.6 provided the general principles to be followed in terminations for default. 41 C.F.R. § 1–8.700–2(d) allowed the use of special termination clauses, but it required that the principles set out in part 1–8 should be followed to the extent practicable. Like the contract clause 9, the standard default clause for

fixed supply contracts, set forth in 41 C.F.R. § 1–8.707(a)(ii), requires a 10-day opportunity to cure. The Board took judicial notice of the similarity of the cancellation clause (clause 9) of the contract to 41 C.F.R. § 1–8.707(a)(ii). It is well settled that validly promulgated regulations have the force and effect of law *G. L. Christian & Assoc. v. United States,* 320 F.2d 345, 160 Ct.Cl. 58, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963).

cellation). Thus, only 3 days were provided before the termination was to have been effective. Needless to say, the contract terms (not to mention the applicable regulations) are intended to control the relationships between the parties. *See Bailey Specialized Buildings, Inc. v. United States*, 404 F.2d 355, 363, 186 Ct.Cl. 71, 86 (1968), where the court stated:

It is concluded that the termination of the contract by defendant without giving the plaintiff ten days' written notice as required by Article 11(a)(i) of the contract constituted a wrongful termination of the contract by the defendant. * *

Having failed to provide the required notice and an opportunity to cure, therefore, the Board found that the defendant's April 7 notice was procedurally defective and could not properly operate as a partial termination for default.

The Board also determined that the Federal Procurement Regulations in effect at the time pertinent to the contract (41 C.F.R. § 1–8.602–3 (1969)) required that a final notice of termination should:

(1) Set forth the contract number [and date];

(2) Describe the acts . . . constituting default;

(3) State that the contractor's right to proceed further with performance of the contract (or a specified portion of the contract) is terminated;

(4) . . .

(5) . . .

(6) State that the Government reserves all rights and remedies provided by law or under the contract . . . ; [and]

(7) State that the notice constitutes a decision that the contractor is in default as specified and that the contractor has the right of appeal under the Disputes clause.

In addition, the Board found that 41 C.F.R. § 1–1.318–1 (1969) required a contracting officer to include a paragraph substantially similar to the following when his final decision is or may be subject to the disputes clause. That regulation provided that:

This decision is made in accordance with the Disputes clause and shall be final and conclusive as provided therein, unless, within [30] days from the date of receipt of this decision, a written notice of appeal (in triplicate) addressed to the (Title of the head of the agency) is mailed or otherwise furnished to the Contracting Officer. * * *

Thus, as a second reason, the Board found that the April 7 notice was ineffective to partially terminate the contract for default because the notice failed to comply with the minimum standards for a final notice as contained in the Federal Procurement Regulations.

This court agrees with the Board's conclusion that the April 7, 1970 notice was procedurally defective for both of the above stated reasons and so failed to partially terminate the contract *for default.*

B. *The Board's Bilateral Modification Theory.*

Having properly found the notice to be ineffective to accomplish a termination for default, the Board then went on to determine what effect it *did* have on the contract. The Board found several facts and from those findings concluded that the parties had agreed to a bilateral modification of the contract. It is with this central conclusion that this court must disagree. This court simply finds no substantial evidentiary support in the record on which to base a conclusion that there had, in fact, been a meeting of the minds reducing the scope of the contract at some point in time after the plaintiff's receipt of the April 7, 1970 notice. In fact, virtually all the evidence points the other way.

The Board gave several reasons to support its conclusion that the parties had agreed to a bilateral modification of the contract: (1) the plaintiff's failure to protest the April 7 notice to the contracting officer or monitor; (2) the reduction by the plaintiff of its training effort limited to training only those 35 trainees who re-

turned to work on April 26, 1970 after the strike ended; and (3) the legal assertion by plaintiff in its proposed conclusions of law submitted to the Board after the close of the administrative hearing to the effect that: -

[T]he act of the Government in its letter of April 7, 1970, prohibiting any new hires made further performance of the contractor unlawful and impossible.

This court believes that none of these underlying facts nor legal assertions support the conclusion that the parties agreed to a bilateral modification of the contract.

To begin with, this court does not find it at all surprising that the plaintiff did not protest the April 7, 1970 notice upon receipt. The notice was so internally confusing and so much a departure from standard Government contracting procedures, that the plaintiff may not have had the faintest idea of how to treat it. If it was, in fact, a default notice, then the contract itself called for a 10-day cure letter before the final notice. If it is a convenience termination, then a protest would accomplish nothing. Also, logically, it could be considered a stop order or a suspension of work order. In the final analysis, the plaintiff apparently opted for a wait-and-see approach, which seems reasonable given the lack of finality inherent in the notice and the invitation to further negotiate.

In any event, the April 7, 1970 notice did not apprise the contractor of the impact of the default notice as a final decision, did not provide for the applicable cure period, and did not outline the contractor's appeal rights. Thus, the notice failed to comply with the applicable contract provision and the applicable provisions of the Federal Procurement Regulations, as discussed above. In the absence of these mandatory statements in the notice, it cannot be presumed that the contractor had knowledge of its rights and, by failing to exercise them, had knowingly waived them and/or had *agreed* to the Government's action. In no way can the Government's April 7, 1970 notice be considered an offer that the plaintiff was free to reject or accept. This was

an attempt by the Government at unilateral action. The plaintiff's lack of protest under the circumstances here present cannot convert that attempted unilateral action into a bilateral agreement.

It is noted in this connection that when the plaintiff was properly advised of his procedural rights in the Government's later attempt to terminate this contract for default (December 2, 1970), the plaintiff did respond with a timely protest/appeal.

Second, the plaintiff's reduction of its training effort to the 35 trainees, who returned to work after the strike was settled on April 26, 1970, also cannot be considered to be an agreement to a bilateral modification of the contract. Plaintiff had received a direct order from the contracting officer clearly prohibiting any further hires or subcontracting activities by the contractor. It would have been impossible for the contractor to continue to hire or subcontract pursuant to the contract without violating the direct authority of the contracting officer. Having been commanded to cease placing of any new orders and to cease hiring new trainees, the plaintiff should first comply with such a direct command of the contracting officer and sort out the legal consequences of the order later. Having complied with the contracting officer's direct unilateral order, the contractor proceeded to negotiate with the Government, as directed, in order to attain a mutually acceptable modification. To conclude that this conduct constituted an acceptance by the plaintiff rising to the level of a bilateral contract agreement defies reason and logic.

Third, this court agrees with the contractor's legal assertion that the April 7, 1970 notice made further performance (new hires and further subcontracts) of the contract unlawful. It is this court's view that the defective April 7 default notice was converted, pursuant to the contract, to a partial termination for the convenience of the Government and hence was a unilateral modification of the contract by the Government. Further hires or subcontracting under the contract by the contractor before the parties renegotiated the contract would

thus be at the contractor's economic risk. It could only be sure to recover for continuing the training of the 35 trainees who returned to work after the strike was settled on April 26, 1970. Any additional performance would not be covered under the contract, as unilaterally modified by defendant.

Thus, this court cannot agree with the Board's conclusion that the April 7, 1970 notice was essentially "a request by the Government for Kisco Co. to agree to a contract modification reducing the scope of the contract and by its subsequent action, of reducing training to those on board," or that Kisco agreed to that request. There is simply no substantial evidentiary support in the record for the conclusion that the parties, by their subsequent conduct, agreed to a bilateral modification of the contract.

C. *The Court's Conversion to a Termination for Convenience.*

As already indicated, this court views the April 7, 1970 notice as giving rise to a partial termination of the contract for the convenience of the Government. This conclusion is based on the language of the contract itself (clauses 9 and 13), the regulations, and the case law enunciated mainly by this court.

Clause 9 of the contract specifically called for an improper default termination (cancellation) to be treated as a termination for convenience.[5] In the absence of a clear showing that the contractor was in default, and given the procedurally defective notice that was sent, this court is compelled to adopt the legal position that the April 7, 1970 notice amounted to a partial termina-

tion for the convenience of the Government. *See Kalvar Corp. v. United States*, 543 F.2d 1298, 1306, 211 Ct.Cl. 192, 206 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). Certainly, the notice of April 7, 1970, purported to be a partial termination for default, and the contractor complied with the directives contained therein. As the court stated in *International Telephone and Telegraph Corp. v. United States*, 509 F.2d 541, 554, 206 Ct.Cl. 37, 60 (1975):

This court has repeatedly stated the remedy available under the contract when a contractor has been improperly terminated for default. Provided the contract contains a termination for convenience clause, the wrongful default is treated as if the contractor had been terminated for the convenience of the Government. *See John Reiner & Co. v. United States*, 325 F.2d 438, 163 Ct.Cl. 381 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964). The contract in issue contains such a clause.

*See also, William Green Construction Co. v. United States*, 477 F.2d 930, 935, 201 Ct.Cl. 616, 624–25 (1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974); *Bailey Specialized Buildings, Inc. v. United States*, 404 F.2d 355, 363, 186 Ct.Cl. 71, 86 (1968).

Furthermore, under clause 13 of the contract, there can be no doubt that the contracting officer could have partially terminated the plaintiff's contract for the convenience of the Government on April 7, 1970. *See, e. g., G. C. Casebolt Co. v. United States*, 421 F.2d 710, 712–13, 190 Ct.Cl. 783, 787 (1970); *Albano Cleaners, Inc. v. United*

---

5. It may be argued that the cancellation clause in the contract does not specifically require or even allow treating procedurally defective default cancellations as convenience terminations, because the clause directs the conversion only when there is a later determination that the contractor has, in fact, performed properly. The standard default termination clause (41 C.F.R. § 1–8.707(e) (1969)) speaks of conversion when the default termination is found "for any reason" to be improper. It is concluded, however, that an argument of this type in this case would be far too restrictive and not indicative of the intent of the parties, nor reflective of

the spirit of the regulations or current trends in case law to avoid breaches in Government contracts. It is noted in this connection that the Board nowhere made a finding to the effect that the plaintiff in this case had improperly performed to the extent that would justify the Government's default notice. Under the facts of this case, it would be difficult for the Board to have so found. The reason given in the April 7, 1970 default notice of "excessive turnover," does not appear to be sufficient to default the contractor in view of clause 11 of the contract and the facts presented at the hearing.

*States*, 455 F.2d 556, 561–62, 197 Ct.Cl. 450, 460 (1972). The authority of the contracting officer to so terminate a contract either in whole or in part, is subject to very few limitations.[6] Moreover, it does not appear that any special written form of a notice would have been required to terminate this contract for the convenience of the Government under clause 13.

In the present case, the Government sent the contractor a notice on April 7, 1970, which purported to partially terminate the contract for default. That notice failed to comply with the contract terms and the relevant regulations. Under such circumstances, this court must follow the case precedent and treat that notice as giving rise to a partial termination for the convenience of the Government.

It follows, in view of the above discussion, that plaintiff should be allowed recovery of those sums/costs as specified in clause 13 of the contract, at least up to the April 10, 1970 effective date specified in the termination notice issued by the Government April 7, 1970.

In addition, this court also concludes that the contractor is entitled to recover those sums/costs as specified in clause 13 of the contract up until the last trainee on board, as of April 10, had completed his training or had otherwise been terminated. The Board found as a fact, which was undisputed by the plaintiff, that all of the MA–4 trainees that had been hired from the inception of the contract up to April 10, 1970, had completed their training or otherwise terminated by September 30, 1970. Accordingly, for the following reasons, this court concludes

that the plaintiff is entitled to recover under clause 13 in addition for the MA–4 training it performed from April 10, 1970 to September 30, 1970.

First, clause 13, by its own terms, is to be applied to those trainee jobs that may be terminated during the course of the contract. As this court determined above, the April 7, 1970 notice clearly invoked clause 13 damages for all trainee jobs performed up to April 10. In addition, this court believes that clause 13 was intended to apply to those trainee jobs that were ongoing as of the April 7, 1970 notice, even though those jobs themselves would be terminated at various times beyond the April 10, 1970 effective date. In short, this notice had the effect of terminating all the jobs in the contract to the plaintiff's economic disadvantage in midcourse of the contract. Therefore, this court concludes that the plaintiff is entitled to recover those sums/costs specified in clause 13 up until the last trainee was trained or otherwise terminated on or about September 30, 1970. This court views this as the proper way to interpret clause 13, under the circumstances of this case, in order to provide an appropriate legal and equitable result.

Second, the procedural defects of the April 7, 1970 notice all served to mislead and confuse the plaintiff as to the notice's legal effects. These procedural defects (lack of finality, lack of notice, improper invoking of clause 9, and the open-ended renegotiation invitation) were in no way cured until the December 2, 1970 purported default termination (cancellation) notice.[7]

---

6. The Court of Claims has found a convenience termination to be invalid if it is based on bad faith or constitutes an abuse of discretion. *See National Factors, Inc. v. United States*, 492 F.2d 1383, 1385–86, 204 Ct.Cl. 98, 103 (1974). A convenience termination was also found to be invalid where it represented an attempt to improperly suspend or debar a contractor from Government contracting, as in *Art Metal—U. S. C., Inc. v. Joel W. Solomon, Administrator of the General Services Administration*, 473 F.Supp. 1 (D.D.C., 1978). No such situation appears to be present here.

7. Although it is unnecessary to decide the question of the validity of the December 2, 1970

default termination (cancellation) notice, it is noted in this connection that this court has found a failure of performance as to collateral matters (such as the special billing substantiation failure here), not going to the essential performance of the contract, insufficient to justify a default termination. *See Universal Fiberglass Corp. v. United States*, 537 F.2d 393, 397–98, 210 Ct.Cl. 206, 216 (1976). In addition, it is also noted that any essential failure of performance after the plaintiff's receipt of the April 7, 1970 notice would appear to be attributable to the Government's issuing that invalid default notice.

Accordingly, for this reason also, this court believes that the plaintiff is entitled to convenience termination damages under clause 13 of the contract up until December 2, 1970. By the terms of clause 13, the essential effect of this reasoning on the dispute is that the contractor is entitled to compute its damages up until the last MA–4 trainee had completed his training, in this case by September 30, 1970.

In summary, as to Count I, this court views this case as a rather routine termination for convenience matter. The DOL clearly was concerned about the training delays and trainee turnover, and thought the Government's money could better be used by other contractors that may not experience the same problems. Laudable as this goal was, it was not a valid reason for defaulting the plaintiff when those problems were not clearly shown to have been the plaintiff's fault. The contracting officer should have terminated this contract for the Government's convenience, and the Board and the Secretary compounded this error in judgment. Accordingly, the contractor is entitled to recover termination for convenience damages, pursuant to clause 13 of the contract, up until the last trainee had completed training or had otherwise terminated.

## Count II

In Count II, plaintiff seeks a *de novo* trial to recover appropriate damages as a result of the Government's alleged breach of the contract. The plaintiff contends that the Government, by its wrongful actions terminating this contract for default, prevented it from fully performing and thus earning its full reimbursements (including profit) under the contract. Plaintiff insists that it is entitled to bring this breach action against the Government because of the unfounded arbitrary and capricious actions of the Government when the contractor was not in default.

The case-law trend has been steadily adverse to the position the plaintiff here maintains. *See General Builders Supply Co. v. United States*, 409 F.2d 246, 251, 187 Ct.Cl. 477, 485–86 (1969). While there has been great confusion over the years as to which actions properly fall "under the contract" and which are for "breach" (*William Green Construction Co., supra*, 477 F.2d 937, 201 Ct.Cl. at 627), it is now well established that where the contract embodies a convenience termination provision, as does the instant contract, a mere wrongful directive to end performance of the work, such as the April 7, 1970 default notice here, will not be considered a breach of the contract, but rather a termination of the contract for the Government's convenience. *See G. C. Casebolt Co., supra; William Green Construction Co., supra; Nolan Brothers, Inc. v. United States*, 405 F.2d 1250, 186 Ct.Cl. 602 (1969). Thus, an exclusive administrative remedy is provided in those Government contracts that contain convenience termination clauses. Such a clause substitutes convenience of the Government recovery costs for any breach of contract damages that plaintiff might otherwise have had where it asserts a claim of improper default termination. *See Inland Container, Inc. v. United States*, 512 F.2d 1073, 206 Ct.Cl. 478 (1975). This is not a case where the contracting officer attempted to terminate the contract in bad faith or that he abused his discretion. *See Kalvar Corp., supra*, 543 F.2d at 1301–03, 211 Ct.Cl. at 198–201. Rather, the contracting officer's April 7, 1970 notice was merely a defective attempt to partially terminate the contract for default. Because of the defective nature of that notice, this court has ruled that it must be treated as giving rise to a partial termination for the convenience of the Government, giving the contractor the right to damages as computed under clause 13 of the contract. Accordingly, plaintiff's request for a *de novo* trial on the merits as to its claim for damages for breach of contract in the instant case must be denied. The administrative remedy remains exclusive, and the second count fails as redundant of the first. *See La Crosse Garment Mfg. Co. v. United States*, 432 F.2d 1377, 1380, 193 Ct.Cl. 168, 172 (1970).

CONCLUSION

Plaintiff's motion for summary judgment as to liability under Count I is granted and the case is remanded to the Secretary of Labor for determination of the amount of recovery under clause 13 of the contract. Further proceedings before this court will be stayed for a period of six (6) months from the date hereof. Defendant's counsel is designated to advise the court by letter to the trial judge of the status of the remand proceedings pursuant to Rule 149(f). Attention of counsel and the Secretary is also directed to Rule 150. Plaintiff's motion for a *de novo* trial as to Count II is denied and that count is dismissed.