per curiam:
Pursuant to the Contract Disputes Act of 1978, 92 Stat 2383, the plaintiff, X-Tyal International Corp. (hereinafter X-Tyal, contractor, or petitioner) seeks review of a decision of the Armed Services Board of Contract Appeals (Board), 81-1 BCA para. 14,831. The decision sustained the termination for default of a contract entered into by X-Tyal and the Defense Personnel Support Center (DPSC), a component of the Defense Logistics Agency, for the manufacture and production of 415,200 headbands to be inserted in military helmet liners. The Government terminated the contract on May 29, 1979, upon a determination that X-Tyal had inexcusably failed to make progress in performance; that the failure did not arise from causes beyond its control, and that such failure was not without fault or negligence on its part. Petitioner contends that the court should direct that the termination for default be converted to one for the convenience of the Government and remanded.
*828 After hearing oral argument, considering the briefs of the parties and reviewing the administrative record, we find that those findings of fact made by the Board which are essential to its decision are supported by substantial evidence and that the Board’s legal conclusion that the contract was properly terminated because of X-Tyal’s inexcusable failure to make progress in the performance of the contract is correct as a matter of law. Accordingly, we affirm the decision of the Board.
I.
The contract was awarded to X-Tyal on February 16, 1979, for a price of $354,996, and contained the standard form Changes, Default and Disputes clauses, together with the Defense Appropriations Act of 1979, which was incorporated therein by reference. X-Tyal was obligated to deliver the first 34,800 headbands by July 1, 1979, and to make monthly deliveries thereafter until May 26, 1980. Leather was the most important component of the headbands and X-Tyal submitted its bid at a unit price of $0,855 each, based on an estimated acquisition price of $1.35 per square foot for leather. X-Tyal’s bid was submitted on January 12, 1979, based on X-Tyal’s own estimate of the cost of the leather, and without obtaining a commitment from any supplier. On January 18, 1979, X-Tyal received a letter from Herman Loewenstein, Inc., the intended supplier of the leather, which quoted a price of $1.35 per square foot, the same price estimated in X-Tyal’s bid. However, the letter from Loewenstein stated that this was not a binding price and was subject to changes in the raw material market. It was suggested that X-Tyal should act promptly in view of the pressure on the raw material market. X-Tyal did not accept the offer; instead it made inquiries of both foreign and domestic suppliers in a quest for lower leather prices.
On January 23, 1979, a representative of the Government’s pre-award survey team visited X-Tyal’s plant and received assurances that the contractor had the personnel and facilities to perform the contract as required, and that the headband leather was available for prompt shipment at *829 a cost of $1.35 per square foot. Unknown to the Government, X-Tyal had received a letter on the same day, January 23, 1979, from Loewenstein which replied to X-Tyal’s letter of January 17, 1979. Loewenstein’s letter stated that the current price for the leather was $1.85 per square foot, which price could not be guaranteed at the time an order was placed, and that delivery in March 1979 could only be assured if an order was placed before February 10, 1979.
By February 16, 1979, when X-Tyal’s bid was accepted, the cost of the leather had risen to a range of $2.15 to $2.25 per square foot. X-Tyal placed no orders for leather, but it wrote the Government on April 9, 1979, that it did not anticipate any problems in performing the contract.
On April 12, 1979, the Government learned that X-Tyal had no binding commitment for the purchase of the leather at $1.35 per square foot as had been represented in the pre-award survey; that X-Tyal had not ordered the leather within one week of receiving the award of the contract, as it had represented; that X-Tyal had not honored its assurances that it would begin production promptly if a contract was awarded, and that it had ordered no leather because of the rising costs.
By April 23, 1979, the Government had received no information from X-Tyal that it had taken action to procure the leather and commence production of the contract. Accordingly, the Government sent the contractor a 10-day cure notice pursuant to the Default clause, and this was received on April 30, 1979. The notice stated that the Government considered that the failure of X-Tyal to secure a firm commitment for the leather needed to comply with the delivery schedule of the contract was a condition which endangered performance of the contract, and that unless the condition was cured within 10 days, the contract would be terminated for default. Following that, there were several telephone conversations between X-Tyal’s representatives and the Government’s representatives, in which X-Tyal was warned that unless it performed the contract, it would be terminated for default. X-Tyal gave no assurance that it would perform the contract, but unknown to Government representatives, X-Tyal had several telephone *830 conversations — on May 3, May 7, and May 8, 1979 — with Loewenstein seeking quotations of prices and availability of the leather. Loewenstein offered, for a period of 48 hours after the telephone conversation, to provide the leather at a price of approximately $2.50 per square foot. The telephone conversations were confirmed by a letter from Loewenstein, dated May 10, 1979, which X-Tyal contends was a firm commitment to supply the leather, and thereby cured any failure on the part of X-Tyál to make progress. The letter will be referred to hereinafter. At the time the letter was received, the 48-hour period mentioned in Loewenstein’s telephone conversations had expired. X-Tyal did not inform the Government of its telephone conversations with Loew-enstein, nor did it place any order for the leather. Had it done so at a price of $2.50 per square foot, it would have suffered an estimated loss of $84,000 on the contract.
On May 9, 1979, X-Tyal responded to the Government’s cure notice by letter which acknowledged that it had not obtained the leather, nor performed the contract, but declared that its nonperformance was excused and justified by the escalation in the price of leather from the time the bid was prepared until the contract was awarded. The letter also stated that leather prices had since continued to increase, and that if X-Tyal had to perform the contract at that time, it would suffer a loss of more than $100,000. It asked to be relieved of performance pursuant to Publ. Law 85-804, 72 Stat. 972, or the Contract Disputes Act of 1978.
In addition to its lack of leather, X-Tyal did not have on hand when it received the cure notice dyes, bundle-tying machinery, sewing machines, or the number of employees that would have enabled it to meet the July 1,1979 delivery date. Thereafter, and until the contract was terminated, this situation did not change and X-Tyal took no action to perform the contract or to assure the Government that it would perform.
II.
In its first of several principal challenges to the Board’s decision, X-Tyal argues that the letter of May 10,1979 from Loewenstein constituted a firm commitment to X-Tyal and *831 thereby cured the contractor’s failure to make progress, assuming there was such a failure. We find that this contention is refuted not only by the evidence adduced at the hearing before the Board by X-Tyal’s principal witness, but also by the Loewenstein letter of May 10, 1979. As the transcript of the testimony shows, X-Tyal’s representative testified on cross-examination that in the telephone conversations of May 3-8, that Loewenstein had mentioned a price of $2.50 per square foot, which it would not guarantee, and also that the supplier would guarantee availability for only 48 hours. The letter of May 10 confirms this. With respect to the price of $2.50 per square foot and the availability of the leather, the letter stated:
Both price and delivery are subject to confirmation at the time of actual booking — raw material price and availability are subject to change daily, if not hourly.
The letter also stated that the leather could not be guaranteed to conform to the specifications of the contract. The 48-hour period referred to in the telephone conversations of May 3-8 had expired by the time the May 10 letter was received.
III.
X-Tyal also attacks the Board’s conclusion that the increases in the cost of the leather did not make the contract commercially senseless nor excuse performance. Petitioner argues that it is well established that extraordinary price rises can constitute excusable causes of delay, and quotes the following from Klapp Roofing Company, Inc., ASBCA 23120; 80-1 BCA ¶ 14,209:
[W]e have held that such costs, whether resulting from inflationary pressures or otherwise, are not generally an excuse for the nonperformance of a contractual obligation, although the law will permit relief where the contractor ceases performance under certain conditions, particularly, when performance has become "commercially senseless.” Jalaprathan Cement Company, Ltd., ASBCA No. 21248, 79-2 BCA ¶ 13,927; see also Brazier Lumber Company, ASBCA No. 18601, 76-2 BCA ¶ 12,207 at 58773-774. "The underlying theory of commercially *832 senseless performance is that such performance is clearly beyond the scope of the bargain and not within the contemplation of the parties at the time of entering into the contract.” L.J. Casey Co., AGBCA 75-148, 76-2 BCA ¶ 12-196. Yet, the incurrence of costs that can be characterized as "steep” or even "substantial” does not render the contract commercially senseless, but it must be shown to be more than merely onereous or more expensive than originally contemplated. Jalaprathan, supra, 68,363. [Emphasis supplied.]
The decision does not support petitioner’s contentions. X-Tyal’s bid was based on its own estimate without securing a quotation or commitment from a supplier. Since the unit price was lower than had been offered a year earlier by another bidder, the Government alerted petitioner that leather prices were escalating and requested that its pricing be reviewed and its bid confirmed. In response to the request, X-Tyal confirmed its bid by telegram of January 15, 1979. The Board correctly found that if X-Tyal had obtained a firm commitment for the leather at the current price when its bid was submitted, it could have eliminated the risk of price increases. The Board also found that if petitioner had promptly placed an order for the leather at the time the contract was awarded, it could have limited its prospective loss to approximately $20,038. In view of these facts, we hold that the Board correctly decided that X-Tyal assumed the risk of the increase in leather prices and has not established that performance of the contract was "clearly beyond the scope of the bargain and not within the contemplation of the parties at the time of entering into the contract.”
IV
X-Tyal makes several other contentions which we do not address, because they do not affect the result. It is clearly established by the record in this case that at the time the contract was terminated, X-Tyal had made no progress toward its performance and that the Government was justified in concluding that the headbands would not be delivered as required by the terms of the contract. Consequently, the contract was properly terminated in accor *833 dance with the Default clause contained therein. Discount Co. v. United States, 213 Ct. Cl. 567, 554 F.2d. 435, cert. denied 434 U.S. 938 (1977); Universal Fiberglass Corp. v. United States, 210 Ct. Cl. 206, 537 F.2d 393 (1976).
AFFIRMED.