**COMPOSITE LAMINATES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–879C.**

United States Court of Federal Claims.

Dec. 15, 1992.

John R. Tolle, McLean, VA, for plaintiff.

Steven J. Abelson, Commercial Litigation Branch, Civil Div., Dept. of Justice, Washington, DC, with whom were David M. Cohen, and Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

HORN, Judge.

## BACKGROUND

This case comes before the court on the plaintiff's motion for partial summary judgment, which defendant opposes.[1] The plaintiff requests the court to convert the Navy's termination for default issued in this case by the contracting officer into one for convenience, and to award appropriate damages, plus interest, fees and costs. The plaintiff, Composite Laminates, Inc. (Composite) has been a commercial and government contractor since 1983, with its principle place of business in Long Beach, California.

## FACTS

For the purposes of this decision on plaintiff's motion for partial summary judgment, the facts appear to be as follows. On June 20, 1990, the Naval Supply Center in Charleston, South Carolina (Navy) awarded a $951,215.00, fixed price contract to Composite Laminates, Inc. to provide, among other things, a set of fiberglass fairing covers and a molded urethane boot for the USS NARWHAL. To manufacture some of the plastic portion of the tooling and laminates under the contract, Composite proposed to utilize, as a subcontractor, Owen Enterprises, Inc. (Owen) of Wilmington, California, and the Navy accepted Owen as the subcontractor. Owen was a known government contractor in the reinforced plastics industry, and was approved by the Navy as generally meeting the rigid quality control/inspection requirements of Military Specification MIL–I–45208A (MIL–I–45108A).[2] The first deliv-

---

1. This court's jurisdiction was invoked pursuant to 28 U.S.C. § 1491 and is uncontested. If plaintiff's motion for partial summary judgment were to be granted, the issue of damages would remain.

2. The documents provided to the court seem to interchangeably designate this contract specification as MIL–I–45208 or MIL–I–45208A. For the purposes of this Opinion, the court will

erables were due October 1, 1990, with the remainder of the contract to be completed by November 15, 1990. Based on laboratory tests completed on July 27, 1990, however, Composite concluded that Owen's production methods were unable to produce laminates with a void content under 3%, a critical contract requirement. After subsequent tests suggested that another, more expensive, production method (the autoclave procedure) would produce almost void-free laminates, Composite began to look for a new subcontractor.

On August 1, 1990, Composite advised the Navy that it had entered into an agreement with Pacifica Aerospace Corporation (Pacifica) to replace Owen. However, a week later, a Navy survey team concluded that Pacifica, because of its lack of tooling experience, might be unable to complete the contract before December 31, 1990, thereby missing the final contract due date by a month-and-a-half. As a result, Composite continued its search for an acceptable subcontractor. On August 10, 1990, plaintiff selected Advanced Tooling, Inc. (Advanced), which promised to produce the tooling on time, by working an around-the-clock schedule.

Apparently not yet satisfied, however, that Advanced was an acceptable subcontractor, on August 14, 1990, a Navy survey team conducted a capability survey of Advanced's facilities. After the survey, but before the cure notice was issued on the next day, Luke Corzine, the president of Composite, and a Navy representative discussed termination of the contract over the phone. The next day, on August 15, 1990, the Navy's contracting officer issued a cure letter stating that Composite has "failed to make sufficient progress in the tooling phase which is hampering the pro-

gression for completing the fairing covers within the required delivery schedule." The letter also stated that the government might terminate the contract for default unless "the condition was cured within ten days." Finally, the letter asked for a milestone plan of action to ensure that delivery dates set forth in the contract would be met, as well as confirmation that an agreement existed between Composite and its subcontractor. In fact, Composite was given twelve days to respond to the contracting officer. The August 15, 1990 cure notice, however, did not specifically mention the quality control/inspection requirements of MIL–I–45208A.

Composite then sought additional information about the cure notice from Joan Music, the Navy's contract administrator. However, the number and substance of the phone calls are in dispute. It is clear, however, that on August 21, 1990, Composite sent a letter by telecopier to Ms. Music outlining accomplishments under the contract, and promising to submit a production schedule by August 24, 1990. The next day, August 22, 1990, the Navy drafted a letter, which was received by plaintiff on August 23, 1990, detailing the deficiencies found at Advanced Tooling, and concluding that Advanced was not qualified to produce the material required under the contract because its inspection system was inadequate and not acceptable to the government.[3]

On August 23, 1990, Composite responded to the Navy requesting some technical information, a number of changes to the contract (including a relaxation in thickness tolerance), and permission to substitute Advanced Tooling for Owen.[4] The plaintiff indicated that it was proceeding to make

---

utilize the latter, which appears on the face of the contract.

**3.** As is discussed more fully below, the plaintiff maintains that this letter from the government, dated August 22, 1990, was a second cure notice, which should operate to give Composite an additional ten days, from August 22, 1990, to respond.

**4.** The relevant dates are unclear at this time. The plaintiff states that it telecoped the August

23, 1990 letter on the same day it was written, and that the letter was never answered. The Navy states that it received the letter (by telecopier) on August 27, 1990, which was the last day of the cure period. The August 23, 1990 letter, however, referenced an attached production procedure. The production procedure, provided to the court, is on Composite's stationary and bears a date, not of August 23, but of August 25, 1990.

corrections to all the deficiencies identified by the government in defendant's August 22, 1990 letter. Also, as an attachment to the plaintiff's August 23, 1990 letter to the Navy, Composite submitted a production schedule showing that all materials would be produced by November 3, 1990, (with testing and packaging to add another week). All representations, however, were predicated upon a quick approval of Composite's production procedure.

On August 29, 1990, the Navy survey team returned to Advanced. Composite asserts that by this time tooling was 80% to 85% complete. Although the parties appear to disagree as to the percentage completed as of August 29, 1990, they agree, however, that none of the tooling was produced in accordance with MIL–I–45208A. Composite also maintains that while the second survey team was at their facility, the Navy gave plaintiff a hand-written response to the deficiencies in the August 22, 1990 letter, and according to the plaintiff a typed version of the response was telecopied to the defendant on August 30, 1990. Three hours after the survey team departed, on August 29, 1990, the Navy terminated the contract for default, citing Composite's failure "to cure the conditions as required in cure notice 4300.203.A4 of 15 August 1990, having failed to comply with the required inspection system (MIL–I–45208A)." The termination also noted that plaintiff had "failed to make progress so as to endanger performance of this contract."

The propriety of the termination of plaintiff's contract, and the circumstances surrounding it are the subject of this litigation. At issue is plaintiff's contention that the Navy wrongfully terminated the contract with plaintiff by: (1) failing to inform

Composite of alleged deficiencies in sufficient detail so that the defects could be remedied during the cure period; (2) failing to recognize Composite's rights pursuant to the August 22, 1990 letter, which plaintiff alleges operated as a second cure notice; (3) failing to grant Composite the required ten day cure period; and (4) ignoring Composite's adequate assurances that it could perform the contract on schedule.

After careful consideration of the briefs filed by the parties, the oral argument held on the motion for partial summary judgment, consideration of the numerous materials filed by the parties, and for the reasons discussed below, the court, hereby DENIES the plaintiff's motion for summary judgment.

## DISCUSSION

### SUMMARY JUDGMENT

Summary judgment in this court is properly granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of this Court is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar in language and effect.[5] Both Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) of the Rules of this court provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there is no genuine issue of material fact and is entitled to judgment as

---

5. The enactment of the Court of Federal Claims Technical and Procedural Improvement Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506, changed the name of the United States Claims Court to the United States Court of Federal Claims. General Order 33 of the United States Court of Federal Claims states: "(1) All General Orders of the Former United States Claims Court are fully applicable to the United States Court of Federal Claims. * * * (2) The Rules of the United States Court of Federal Claims should be abbreviated 'RCFC,' " * * *.

In general, the Rules of this court are closely patterned upon the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the Rules of this court, including Rule 56. See Imperial Van Lines Int'l, Inc. v. United States, 821 F.2d 634, 637 (Fed.Cir.1987); Lichtefeld–Massaro, Inc. v. United States, 17 Cl.Ct. 67, 70 (1989).

a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Ass'n, Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991).

■ Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Unig Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

■ When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton In-*

*dustrial Products, Inc. v. Solid State Systems Corp.*, 755 F.2d 158, 163 (Fed.Cir. 1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can show, alternatively, that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assoc.*, 20 Cl.Ct. at 679. If the moving party makes this showing, the burden is placed on the nonmoving party to show that a genuine factual dispute exists by presenting evidence establishing the existence of an element of its case upon which it bears the burden of proof. *Lima Surgical Assoc.*, 20 Cl.Ct. at 679. If, under no scenario, can the nonmoving party present the evidence necessary to support its case, then there should be no genuine need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Under Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and admissions, in order to show that a genuine issue for trial exists. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553.

Because termination for default is a drastic remedy, "[t]he Government should bear the burden of proof with respect to the issue of whether termination for default was justified, regardless of the forum and regardless of whose 'claim' is being asserted." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir. 1987); *S.M.S. Data Prods. Group v. United States*, 17 Cl.Ct. 1, 10 (1989). Although

a plaintiff can prevail by showing an absence of evidence to support the defendant's case, *Celotex Corp. v. Catrett*, 477 U.S. at 325, 106 S.Ct. at 2553; *S.M.S. Data Prods. Group, Inc. v. United States*, 17 Cl.Ct. at 6, and despite the fact that the defendant bears a heavy burden on the issue of proving the propriety of the default termination, in the instant case, the plaintiff has been unable to show that there is no evidence in support of the government's case. The plaintiff's motion for partial summary judgment, therefore, must fail.

In support of its motion for partial summary judgment, the plaintiff asserts four main arguments and urges that there are no material facts in dispute as to any of the issues raised. First, the plaintiff contends that the Navy's cure notice of August 15, 1990 was defective because it contained no particular allegations and because the government had never mentioned inspection problems in prior communications so as to allow plaintiff to remedy the defects during the cure period. The defendant, however, replies that under plaintiff's theory of the case, there is a genuine issue of material fact as to the adequacy of the government's cure notice of August 15, 1990. The defendant argues that genuine issues of material fact exist as to whether or not Composite was aware, through correspondence, telephone conversations, and the cure notice of August 15, 1990, regarding what it had to do in order to avoid termination of its contract for default.[6] Second, the plaintiff asserts that the Navy's letter of August 22, 1990 was either a supplement to the August 15, 1990 cure notice, or a second cure notice because the August 22, 1990 letter informed Composite, for the first time, of Advanced's alleged inspection deficiencies. The government, contends, however, that a genuine issue of material fact exists regarding whether the August 22, 1990 letter was a second cure notice, because the August 22, 1990 letter did not contain any of the standard cure notice

language. In addition, defendant points out that in plaintiff's letter of August 30, 1990, Composite did not refer to the August 22, 1990 letter as a cure notice, but appears to have constructed this theory later. Third, the plaintiff suggests that if the Navy's August 22, 1990 letter was a second cure notice or a supplemental notice, it initiated a second cure period, and that, therefore, the Navy's termination for default was improper because it allowed only seven days to cure from August 22, 1990, instead of the required ten days. The defendant responds that because there is a genuine issue of material fact as to the nature of the August 22, 1990 letter, there is also a question regarding whether a new cure notice period was triggered. Consequently, the defendant argues there is a significant dispute regarding the date upon which the required cure period would expire, prior to which it would be improper to decide to terminate the contract. And, fourth, the plaintiff contends that the Navy ignored Composite's assurances that it could perform the contract on schedule, despite the difficulties identified in the cure notice. To this, the defendant replies that it was Composite which provided documentation, including milestone plans, clearly showing that deliveries would be made after the required delivery dates, casting serious doubt as to whether contract performance could be completed in a timely fashion.

## DEFAULT AND TERMINATION

The government's right to terminate a supply or service contract for default stems from the Default clause included in the Federal Acquisition Regulations (FAR). In relevant part, the FAR Default clause reads as follows:

DEFAULT (FIXED–PRICE SUPPLY AND SERVICE) (APRIL 1984)

(a)(1) The Government may, subject to paragraphs (c) and (d) below, by written notice of default to the Contractor, terminate this contract in whole or in part if the Contractor fails to—

---

**6.** The parties did not provide the court with a copy of the full contract, including the General Provisions. Therefore, the court cannot determine with certainty whether or not a written cure notice was required under the contract, despite the fact that the standard Federal Acquisition Regulation (FAR) Default clause so requires.

(i) Deliver the supplies or to perform the services within the time specified in this contract or any extension;

(ii) Make progress, so as to endanger performance of this contract (but see subparagraph (a)(2) below); or

(iii) Perform any of the other provisions of this contract (but see subparagraph (a)(2) below).

(2) The Government's right to terminate this contract under subdivisions (1)(ii) and (1)(iii) above, may be exercised if the Contractor does not cure such failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure.

48 C.F.R. § 52.249–8 (1989).[7]

All default terminations are not the same. Subparagraph (a)(1)(i) of the Default clause "... expresses a general intent to give the Government a right, under subparagraph (i) to terminate for default without any advance notice when the default consists of a failure to meet the contract due date as to end items." *Bailey Specialized Bldgs., Inc. v. United States,* 186 Ct. Cl. 71, 82–83; 404 F.2d 355, 361 (1968). Subparagraph (a)(1)(ii) entitles the contractor to a ten-day notice, and to an opportunity to cure the default as a condition precedent to any right of the government to terminate. *Id.* Subparagraph (a)(1)(iii) also allows a termination after a ten-day cure notice, for failure to perform other provisions of the contract (other than failure to deliver or failure to make progress), but only when the "other provision" is a material requirement of the contract.[8]

■■■■ Failure to provide the notice and an opportunity to cure when required will render a default termination procedurally defective. *Kisco Co. v. United States,* 221 Ct.Cl. 806, 821, 610 F.2d 742, 751 (1979).

When a contracting officer has improperly terminated a contract for default, the remedy is to convert that decision into a termination for the convenience of the government. 48 C.F.R. § 52.249–8(g) (1989); *Darwin Constr. Co. v. United States,* 811 F.2d 593, 597, 598 (Fed.Cir.1987); *S.M.S. Data Prods. Group,* 17 Cl.Ct. at 10. "It is only where a contractor is defaulted when he is *not* at all in default that a breach can be said to occur." *Schlesinger v. United States,* 182 Ct.Cl. 571, 584, 390 F.2d 702, 709–710 (1968) (emphasis in original).[9]

In the instant case, on August 15, 1990, the government issued a cure notice and terminated the plaintiff's contract on August 29, 1990 for failure to make progress. "Failure to make progress is obviously something different from failure to deliver, or else the default clause would not provide separately for both...." *Universal Fiberglass Corp. v. United States,* 210 Ct.Cl. 206, 216–17, 537 F.2d 393, 398 (1976). Failure to make progress is broader and more general than nondelivery. Failure to make progress may contribute to nondelivery, however, because it encompasses a range of circumstances other than the nondelivery which endanger performance under the contract. *Tubular Aircraft Prods., Inc.,* 213 Ct.Cl. 749, 566 F.2d 1190 (1977) (text of Opinion of trial judge appears in 23 CCF ¶ 81,327 at 86,617 (1977)). "[T]he 'cure notice' provision for 'failure to make progress' terminations is obviously intended to supply the absence of a specific time marker to advise when the minute for default has been reached, such as exists when a contract delivery date has passed without delivery." *Universal Fiberglass Corp. v. United States,* 210 Ct.Cl. 206, 217, 537 F.2d 393, 398 (1976). If a possible termination is predicated upon failure to make progress, so as to endanger performance of the con-

---

**7.** Since neither plaintiff nor defendant has provided to the court the General Provisions section of the contract, or the specific Default clause included in the instant contract, for the purposes of this summary judgment decision only, the court will assume that the Standard General Provisions were inserted into the contract at issue.

**8.** See John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 700–02 (2d ed. 2d printing 1986).

**9.** The court notes that in the case at bar, plaintiff has asked for conversion from termination for default to termination for convenience, and to award appropriate damages, plus interest, fees and costs.

tract, the contracting officer shall give the contractor written notice specifying the failure and providing a period of at least 10 days in which to cure the failure. At the end of that period, unless it is determined that the failure has been cured, the contracting officer may issue a notice of termination for default. *See* 48 C.F.R. § 49.402–3(d) (1989); *Bailey Specialized Bldgs., Inc. v. United States,* 186 Ct.Cl. 71, 85, 404 F.2d 355, 362 (1968); *Schlesinger v. United States,* 182 Ct.Cl. at 576, 390 F.2d at 704.

## THE ADEQUACY OF THE CURE NOTICE DATED AUGUST 15, 1990

 The plaintiff contends that because the Navy's August 15, 1990 cure notice (for failure to make progress) did not contain detailed allegations, and because the Navy never mentioned inspection problems in the notice or in prior communications, the cure notice was defective.

Standards by which to determine the adequacy of a cure notice include the following:

> The notice required by the default clause is intended to inform the contractor that it has failed to meet one or more terms of the contract, except for the delivery clause, as perceived by the government at the time. It need not cite each and every failure, but it must list with enough particularity the performance failures which have placed the contractor in danger of termination for default. Where the plaintiff has received prior notice of its failures, whether by telephone, letter, or word of mouth, that information will be considered properly in conjunction with the cure notice.

*International Verbatim Reporters, Inc. v. United States,* 9 Cl.Ct. 710, 721 (1986) (citing *Finast Metal Products, Inc.,* 77–1 B.C.A. (CCH) ¶ 12,331 (1977). *See also National Rag & Waste Co. v. United States,* 237 F.2d 846, 847–48 (5th Cir.1956) and *RFI Shield–Rooms,* 77–2 B.C.A. (CCH) ¶ 12,714, 1977 WL 2320 (1977)). "In like manner, the cure notice need not note the defects that formed the basis for the default termination if it can be established from the record that the contractor had sufficient notice of the asserted defects." *Red Sea Trading Assocs., Inc.,* 91–1 B.C.A. (CCH) ¶ 23,567 at 118, 155, 1990 WL 255735 (ASBCA 1990). *See Halifax Eng'g v. United States,* 915 F.2d 689, 691 (Fed.Cir.1990).

Accordingly, in *International Verbatim Reporters,* a cure notice referencing concerns discussed in a meeting was satisfactory notice, when coupled with prior conversations and letters to plaintiff. *International Verbatim Reporters, Inc. v. United States,* 9 Cl.Ct. at 723. Similarly, in *American Marine Upholstery v. United States,* after a contractor outlined its production problems in a letter asking for more time to complete the contract, a government preliminary [cure] notice threatening to terminate, absent evidence of "satisfactory progress toward completion," was not defective for lack of specificity. *See American Marine Upholstery Company v. United States,* 170 Ct.Cl. 564, 572, 345 F.2d 577, 581 (1965). Likewise, when the government, on numerous occasions, has notified the contractor of failures which were endangering contract performance, the United States Court of Appeals for the Federal Circuit has found that a cure notice letter was adequate although it failed to list specific defects. *See Halifax Eng'g, Inc. v. United States,* 915 F.2d at 691 (1990). Recently, the Department of Veterans Affairs Board of Contract Appeals upheld a default termination when a cure notice lacked specificity, because discussions held, and additional information furnished by the government after issuance of a cure notice, gave the contractor an understanding of what was expected. *Appeal of Danrenke Corporation,* No. VABCA–3601, 1992 WL 201036, 1992 VABCA LEXIS 33 at *23 (August 18, 1992). On the other hand, a cure notice which failed to fully advise the contractor of perceived deficiencies, and which cited only to insufficient detail in operational plans, procedures, and schedules for preventive maintenance, was defective, particularly when coupled with the contracting officer's repeated refusal to discuss corrections necessary to proceed with the contract. *Arctic Refrigeration & Air Conditioning, Inc.,* 87–3 B.C.A. (CCH) ¶ 20,078 at 101,656, 1987 WL 41195 (GSBCA 1987).

In relevant part, the cure notice sent to plaintiff, dated August 15, 1990, stated:

It was the Government's understanding at contract award that Owens Enterprises would be your subcontractor. You have subsequently proposed to use Pacifica Aerospace Corporation, Costa Mesa, CA and Advance [sic] Tooling Concepts, Inc., Ontario, CA as subcontractors in producing the Fiberglass Fairing Covers. DCMAO has concluded a Capability Survey on both Pacifica Aerospace Corp. and Advanced Tooling Concepts, Inc.

As a result of the above surveys, DCMAO has advised the Contracting Officer that Composite Laminates has failed to make sufficient progress in the tooling phase which is hampering the progression for completing the fairing covers within the required delivery schedule.

You are hereby notified that the Government considers your failure to make progress a condition that is endangering performance of the contract. Therefore, unless this condition is cured within 10 days after receipt of this telefaxed notice, the Government may terminate for default under the terms and conditions of the Federal Acquisition Regulation Clause 52.249–8 entitled 'Default (Fixed-price Supply and Service)' which is a part of your contract. Under a termination for default, Composite Laminates would be liable for excess cost associated with the reprocurement of the fairing covers.

The August 15, 1990 cure notice sent to plaintiff must be compared to the notice of termination, dated August 29, 1990, in which the Navy gave the following reasons for terminating Composite's contract for default:

You are hereby notified that your company, Composite Laminates, Inc. is in default under contract N00612–90–C–T183 having failed to cure the conditions as required in cure notice 4330. 203.A4 of 15 Aug 1990, having failed to comply with the required inspection system, MIL–I–45208A. It is hereby found that your company is in default under Contract N00612–90–C–T183 having *failed to make progress, so as to endanger per-*

*formance* under this contract. On the basis of the foregoing, your right to proceed further with performance under the contract is hereby terminated pursuant to the Federal Acquisition Regulation (FAR) Clause entitled 'Default (Fixed–Price Supply and Service)', said termination to be effective 29 August 1990. This notice constitutes a decision that you are in default as specified, and that the failure to perform was not due to causes beyond your control and without fault or negligence.

(Emphasis in original.)

The plaintiff maintains that the Navy's cure notice was deficient because it was not specific enough about the alleged deficiencies under the contract, and that the August 15, 1990 cure notice had failed to mention inspection problems (including the required inspection system, MIL–I–45208A), which, nonetheless, became part of the basis of the default termination. With respect to the alleged lack of specificity in the cure notice, there appear to be genuine issues of material fact in dispute as to exactly what Composite knew on August 15, 1990, and whether plaintiff was sufficiently informed regarding what it had to do to avoid termination. With respect to the alleged failure to comply with inspection system MIL–I–45208A, although the court need not decide the issue on summary judgment, it is clear that if the August 15, 1990 cure notice was adequate and properly identified deficiencies, other than those dealing with inspection problems under MIL–I–45208A, the failure to call attention to MIL–I–45208A as a ground for deficiency in the August 15, 1990 cure notice does not defeat, necessarily, the validity of that cure notice, and of the subsequent default termination. The inspection deficiencies under MIL–I–45208A, then, merely become additional, cumulative, contract problems, and not the basis for the default termination.

Regarding the degree of specificity required in the cure notice, it is clear that the Navy and Composite communicated a number of times prior to, and following, plaintiff's receipt of the August 15, 1990 cure

notice. As noted above, telephone, letter or word of mouth communications will be considered in conjunction with a cure notice. *International Verbatim Reporters v. United States*, 9 Cl.Ct. at 721. On August 10, 1990, for example, Mr. Gaskins of the Navy survey team and Mr. Luke Corzine, President of Composite, had a lengthy discussion. Additionally, after the survey on August 14, 1990, but prior to receiving the August 15, 1990 cure notice, Mr. Corzine had a telephone conversation with the Navy's Commander Bales and unidentified others. According to the affidavit submitted by Mr. Corzine, "because the government thought that Composite could not meet the contract's schedule," termination was mentioned. While the plaintiff objects to the admission of a "telephone conversation transcript" of that conversation as hearsay, the court need not rely on the transcript to deny plaintiff's motion for partial summary judgment. Mr. Corzine's affidavit, offered into evidence by the plaintiff, also creates questions about what was discussed. While Mr. Corzine admits in his affidavit that the Navy discussed terminating Composite's contract, he suggests that the conversation was ambiguous, and gave no specifics.[10] At this time, the court makes no judgment concerning the truth of Mr. Corzine's affidavit, but to the degree the affidavit is vague, it raises for the court questions regarding material issues in dispute. Moreover, it strains credulity that the president of an experienced government contractor, after being told that his company was about to lose a $951,215.00 contract, would not insist upon a few details as to what he had to do to avoid default termination. Therefore, on one of the central issues in the instant summary judgment motion, whether the Navy's August 15, 1990 cure notice, plus any other communications, such as telephone calls, correspondence, and/or personal contacts, put the plaintiff on notice as to what it had to do to avoid termination for default, the court finds that there are genuine issues of material fact in dispute.

The status of plaintiff's subcontractor also raises another basis for deciding that there are genuine issues of material fact in dispute regarding the adequacy of the August 15, 1990 cure notice. It is undisputed that Owen Enterprises, Inc. was the subcontractor of record when the contract was awarded. Although it is true that on August 1, 1990 Composite informed the Navy that Pacifica would be its subcontractor, and that on August 10, 1990 Composite entered into an Agreement with Advanced, it is less than clear as to who was the subcontractor of record on August 15, 1990, the date of the alleged cure letter. In fact, it was not until August 23, 1990 that Composite made a written request to the Navy to substitute Advanced for Owen. The uncertain relationships between Composite and Pacifica, or plaintiff and Advanced, therefore might be best reflected by the government's August 15, 1990 notice, which stated that Composite *"proposed* to use Pacifica Aerospace Corporation, Costa Mesa, CA *and* Advance Tooling Concepts, Inc., Ontario, CA as subcontractors...." (Emphasis added.) Also the record does not contain a contract modification signed by plaintiff and the government, which would be required to officially substitute, as the subcontractor, either Pacifica or Advanced for Owen.

Assuming that Advanced was not the official subcontractor of record on August 15, 1990, it is entirely possible that the cure notice requirement to inform the contractor of the alleged deficiencies (*see International Verbatim Reporters v. United States*, 9 Cl.Ct. at 721) could be satisfied simply by stating that the proposed subcontractor was unacceptable. Assuming Advanced was merely a proposed subcontractor, to which Composite was not contractually bound, the plaintiff might have been able to avoid default by finding another subcontractor acceptable to the government. Therefore, it is not altogether cer-

---

**10.** In addition to Mr. Corzine's discussions with the Navy, upon receipt of the cure notice, Composite officials talked with Joan Music, the Navy's contract administrator by phone. It remains unclear from the materials before the court at this stage of the proceedings, however, what was discussed, or when this conversation took place.

tain that the Navy was required to provide specific information about the deficiencies at Advanced (as the plaintiff maintains), as opposed to simply stating that Composite had failed to find an acceptable subcontractor. The court defers this question to a later time in the proceedings given the existence of the material facts in dispute.

There is also a lack of clarity in the documents provided to the court as to whether under the contract the inspection system requirements in MIL–I–45208A applied to tooling, as opposed to just to the end items (fairing covers and urethane boot).[11] If inspection system requirements applied to tooling, the Navy's cure notice citing a failure "to make sufficient progress in the tooling phase" might reasonably be interpreted to include a failure to meet inspection/MIL–I–45208A requirements. Thus, the August 15, 1990 notice would be consistent with the default termination, which specifically mentions MIL–I–45208A. On the other hand, if the inspection system requirements did not apply to tooling, it is not altogether clear to what the Navy was referring when it terminated Composite's contract, prior to delivery of end items, for "having failed to comply with the required inspection system, MIL–I–45208A" in the tooling phase of the contract.

THE AUGUST 22, 1990 LETTER AS A SECOND CURE NOTICE

■ The plaintiff's second argument is that the Navy's letter, dated August 22, 1990, was either a second cure notice or a supplement to the August 15, 1990 cure notice and, therefore, initiated a new 10–day cure period. The defendant contends that there is a genuine issue of material fact on this issue, noting that even the plaintiff's letter written a day after the

default termination referenced the August 15, 1990 letter, not the August 22, 1990 letter.

In determining whether a cure notice is adequate, function is more important than form. For example, in *Orchids Paper Prods. Co.*, a cure notice was deemed adequate when it expressly warned of conditions to be corrected and gave a deadline for doing so, even though the notice neither followed forms in the Federal Acquisition Regulations to the letter, nor was it titled "cure notice." *Orchids Paper Prods. Co.*, 91–2 B.C.A. (CCH) ¶ 23,965 at 119,969, 1991 WL 65462 (GSBCA 1991). A cure notice for failure to make progress may even be called a show cause notice, pursuant to 48 C.F.R. § 49.402–3(d) (1989). Functionally, the requisites of a cure notice are that it must set forth both deficiencies in performance and threaten default. *Harold Burgmayer Real Estate, Inc.*, 88–3 B.C.A. (CCH) ¶ 21,063 at 106,364, 1988 WL 86603 (HUD BCA 1988). However, "an oral statement or notice of deficiency and request to cure the deficiency is not sufficient where the contract calls for a written notice and request." *Electro–Magnetic Refinishers, Inc.*, 79–1 B.C.A. (CCH) ¶ 13,-697 at 67,180, 1979 WL 2215 (GSBCA 1979); *Bailey Specialized Bldgs., Inc. v. United States*, 186 Ct.Cl. 71, 85, 404 F.2d 355, 362–63 (1968).

It is questionable that the August 22, 1990 letter was, in fact, a cure notice. But, assuming, arguendo, in accordance with the *Burgmayer* standards advocated by the plaintiff, that a cure notice must set forth deficiencies and threaten default, the August 22, 1990 letter falls short. While the August 22, 1990 letter does communicate deficiencies, it does not threaten default. Instead, the letter warns that non-

11. The contract, to the extent that limited excerpts (six of fifty-eight pages of the contract and one of three modifications) were provided to the court for the purposes of deciding this summary judgment motion, indicates on page one, "MIL–I–45208A 'Inspection System Requirements' applies." Luke H. Corzine and John S. Frey, president and vice president of Composite, respectively, both stated in affidavits submitted to the court that no tooling was required by the contract, and Frey specifically explained that MIL–I–45208A did not apply to

tooling, only to the line items of the contract. In addition, page twelve of the contract includes the following language:

> E8(b) The contractor shall comply with the specification titled 'Inspection System Requirements', number MIL–I–45208A in effect on the contract date, which is hereby incorporated into this contract. Without a copy of the contract, including the scope of work, it is difficult to fully understand the definition of tooling or end products under the contract.

conforming material may be rejected as follows: "Any material which is produced or manufactured that is not in strict compliance with the terms and conditions of the subject contract may be cause for rejection." The initial rejection of nonconforming material does not necessarily lead to a default termination. To the contrary, Federal Acquisition Regulations state that rather than reject nonconforming supplies, contractors should be given an opportunity to correct or replace nonconforming supplies when this can be accomplished within the required delivery schedule. 48 C.F.R. § 46.407(b) (1989). Furthermore, under certain circumstances, the government may accept nonconforming supplies. 48 C.F.R. § 46.407(c) (1989). While tendering nonconforming goods on the due date is a basis for termination, the basis for such termination is considered a "failure to deliver" under the default clause.

## THE AUGUST 22, 1990 LETTER STARTED A NEW TEN DAY CURE PERIOD

The plaintiff's third argument, which is closely related to the second, urges that the Navy's August 22, 1990 letter initiated a ten day cure period, and that the Navy's termination for default after seven days was improper. This argument hinges on a finding by the court that the August 22, 1990 letter was an adequate cure notice. The plaintiff also argues that even if the first cure notice was adequate, that a second cure notice automatically stays any previous cure period (in this case triggered by the August 15, 1990 letter) and starts a new ten day cure period running.

 It is true that when the government proceeds under subparagraph (a)(ii) of the Default clause, it must give the contractor notice specifying the contractor's failure and affording the contractor a period of at least ten days after receipt thereof to cure such failure. *Bailey Specialized Bldgs., Inc. v. United States*, 186 Ct.Cl. 71, 86, 404 F.2d 355, 362 (1968). In cases in which the contractor fails to make progress so as to endanger performance of a contract, if the government fails to give

ten days advanced written notice (cure notice), a termination for default will be converted into a termination for convenience, if the contract contains a termination for convenience clause.[12] *Bailey Specialized Bldgs., Inc. v. United States*, 186 Ct.Cl. 71, 86, 404 F.2d 355, 362–63 (1968). *See also* 48 C.F.R. § 52.249–8(g) (1989).

Despite the fact that a ten day cure period is normally required, some Boards of Contract Appeals have permitted the government to terminate contracts when no cure period was specified, or even if a cure notice is not issued, when the contractor demonstrates a clear determination not to perform. For example, when the contracting officer did not specify a cure period, but there is no evidence that the contractor would have performed any differently had there been a period specified, a termination for default is not considered improper simply because no cure period was specified. *Burgmayer*, at 106,364; *Chuprov d/b/a Release Reforestation*, 87–2 B.C.A. (CCH) ¶ 19,778 at 100,086, 1987 WL 40844 (AGBCA 1987). Furthermore, in cases of abandonment, termination for default may be valid, even without a cure notice. *Johnson & Gordon Security v. General Servs. Admin.*, 857 F.2d 1435, 1438 (Fed.Cir.1988); *Fairfield Scientific Corp.*, 78–2 B.C.A. (CCH) ¶ 13,429 at 65,-636, 1978 WL 2268 (ASBCA 1978).

Because the court has concluded that material issues of fact are in dispute in the case at bar, and that summary judgment must be denied, this court need not decide at this time whether the August 22, 1990 letter was an adequate cure notice. It is clear, however, that if the August 15, 1990 letter was inadequate, the Navy terminated the contract without giving the required ten day cure period.

In its motion for partial summary judgment the plaintiff alludes to another possibility, that both the August 15, 1990 and August 22, 1990 letters were adequate cure notices. The plaintiff urges that if this is true, the second cure notice initiated a new cure period, while at the same time causing a stay of the first cure period. Plaintiff

---

**12.** In the instant case, once again, not having been provided the contract, the court does not

know whether such a clause was included in the contract at issue.

seems to suggest that each subsequent cure notice, in effect, acts as a stay of the government's right to terminate under a cure period triggered by a previously issued cure notice (referred to below as plaintiff's automatic stay theory).

The plaintiff cites to *Cervetto Building Maintenance Co. v. United States*, 2 Cl.Ct. 299 (1983), and *Introl Corporation*, 80–1 B.C.A. (CCH) ¶ 14,380, 1980 WL 2381 (DOT CAB, 1980), as support. In *Cervetto*, the government elected not to rely on a cure notice that it had issued on March 14, 1980, for failure to perform "other provisions" in the contract. Subsequently, on March 19, 1990, the government issued a cure notice for failure to make progress, which was received by plaintiff on March 24, 1990, and was the basis of a decision to terminate on April 3, 1990. The court held that when the "irrevocable decision to terminate is made before the end of the cure period and a contractor's timely efforts to cure are ignored, the termination is improper. *Cervetto*, 2 Cl.Ct. at 303.

In *Introl*, the contract delivery date was April 9, 1979. On April 2, 1979, however, the contracting officer issued a cure notice for failure to make progress, triggering a 10 day cure period to conclude April 12, 1979. Nonetheless, on April 11, 1979, the contracting officer terminated the contract for default for failure to deliver on April 11, 1979. The Board in *Introl* stated:

> The principal issue is: Does the Government have the right to terminate a contract for default for failure to perform [13] during the pendency, but before the end of a cure period granted to the contractor under the Default clause of the contract? It does not have that right. Once a cure period has been granted to a contractor his contract may not be terminated until that period has expired even though he has exceeded the original performance period. [Citations omitted] (Government was required to wait until end of extended cure period before it could terminate for default.) It should be observed that terminations for default

are a harsh measure and being a species of forfeiture, they are strictly construed. *Introl Corporation*, 80–1 B.C.A. (CCH) ¶ 14,380 at 70,904, 1980 WL 2381 (DOT CAB 1980).

Initially, the court notes that both *Cervetto* and *Introl*, although persuasive, are not binding precedent on this court. Moreover, neither case, relied on so heavily by the plaintiff, truly parallels the case at bar. But, more important, the real difficulty for plaintiff in the case at bar is that at this time, there remain too many material facts in dispute, such as, was the August 15, 1990 letter a proper cure notice, was the August 22, 1990 letter a cure notice, for the court to even reach a determination as to whether *Cervetto* or *Introl* are analogous to the case at bar.

## THE NAVY IGNORED PLAINTIFF'S ASSURANCES THAT IT COULD CURE THE DEFICIENCIES ON SCHEDULE

 The plaintiff's fourth contention is that the Navy ignored Composite's assurances that the plaintiff could cure the recognized deficiencies. Defendant responds that, quite to the contrary, plaintiff provided a milestone chart which showed completion in a timely fashion would not occur.

 When the government issues a cure notice, in order for a contractor to avoid default, a contractor must be able to provide adequate assurances to the government that it can complete contract requirements on time. "A default termination is a drastic sanction which should be imposed or sustained only for good grounds and on solid evidence." *J.D. Hedin Constr. Co. v. United States*, 187 Ct.Cl. 45, 57, 408 F.2d 424, 431 (1969). "[P]arties are entitled to ask for reassurances when persons with whom they have contracted have by word or deed created uncertainty about their ability or intent to perform, and they are entitled to treat the failure to provide such assurances as a repudiation of the contract." *Tubular Aircraft Prods., Inc. v. United States*, 213 Ct.Cl. 749, 566 F.2d 1190 (1977) (text of Opinion of trial judge appears in 23 CCF ¶ 81,327 at 86,619 (1977)). "Termination for default is appro-

---

**13.** In fact, the government in *Introl* terminated the contract for failure to deliver.

priate if a demonstrated lack of diligence indicates that [the government] could not be assured of timely completion." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987). *See also Discount Co., Inc. v. United States*, 213 Ct.Cl. 567, 575, 554 F.2d 435, 441, *cert. denied*, 434 U.S. 938, 98 S.Ct. 428, 54 L.Ed.2d 298 (1977). The defendant must consider all of the contractor's efforts to comply with the cure notice. *Cervetto Bldg. Maintenance Co. v. United States*, 2 Cl.Ct. 299, 302–03 (1983). Default termination is not permitted merely on the ground that performance is less than absolutely certain. Rather, there must be a reasonable belief that there was "no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987) (citing *RFI Shield–Rooms*, 77–2 B.C.A. (CCH) ¶ 12,714, at 61,-735, 1977 WL 2320 (ASBCA 1977)); *see also Discount*, 554 F.2d at 441 (justifiable insecurity about the contract's timely completion required).

In this type of situation, the Government must prove that the contractor's failure to progress was endangering performance of the contract. It does not have to prove that it was actually impossible for the contract to have been completed by the specified delivery date but only that completion by that date was being endangered by the lack of progress. This burden is dual-faceted. The Government must prove that there was a lack of progress and that contract completion was being endangered by it.

*RFI Shield–Rooms*, 77–2 B.C.A. ¶ 12,714 at 61,735, 1977 WL 2320 (ASBCA 1977).

The assurances offered by the contractor must be substantive and realistic. In *X-Tyal International Corporation*, the Board noted that the contractor,

did not, in fact, cure the default situation. X-tyal makes the mistake of considering an offer to be the same thing as a contract. The evidence shows that in response to the cure notice X–Tyal sought and received from its leather supplier quotations as to price and availability of the needed leather. However, such quotations were, at most, nothing more than offers to sell. It is basic law that unless an offer is accepted there is no contract. Without a contract neither party is bound to do anything. Since X–Tyal never accepted any of these offers by placing an order for the leather there was never a binding obligation on the supplier to furnish leather. X–Tyal was no closer to having a binding commitment for the needed leather at, during, or after the cure notice period than it had been prior to the cure notice. Obtaining a quotation or offer without more does not cure a default situation.

*X–Tyal Intn'l Corp.*, 229 Ct.Cl. 827, 1982 WL 26548 (1982) (text of the Board's opinion appears in 81–1 B.C.A. (CCH) ¶ 14,830 at 73,207, 1980 WL 2760 (ASBCA 1980)). Accordingly, "a contract may properly be terminated after a cure notice has been issued, when a contractor has not taken such action and made such progress as to assure timely completion of its required performance." *Id.* at 73,206. However, "when an irrevocable decision to terminate is made before the end of the cure period, and a contractor's timely efforts to cure are ignored, the termination is improper." *Cervetto Bldg. Maintenance Co. v. United States*, 2 Cl.Ct. 299, 303 (1983).

The court finds that there are genuine issues of material fact in dispute regarding whether or not Composite gave the Navy adequate assurances that it could manufacture acceptable products within the time allowed for contract completion. For example, in view of the tight delivery schedule proposed by Composite, with no allowance for contingencies, and because the proposed revised schedule was contingent on a number of contract changes to which the Navy had to agree, it is not clear whether Composite's assurances were realistic and, therefore, adequate. Composite planned to meet due dates by having its subcontractor (Advanced) work 24 hours a day, seven days a week. Such a schedule leaves no room for unforeseen circumstances. Moreover, the delivery schedule, proposed by Composite on August 23, 1990, was based upon the Navy's quick approval

of the company's production procedure. If the production procedure was disapproved, or required modification, it is likely that the delivery dates would have slipped. Composite also requested certain changes to the contract, including a relaxation in thickness tolerance. If the Navy refused to change the contract specifications and terms, it is possible that the production schedule would again have slipped. Finally, the acceptability of line item 0003, produced at Expanded Rubber and Plastics, was dependant on the Navy's agreement to another contract modification. As before, if the Navy had refused to change the contract as requested, it is possible that the production schedule would have slipped for this reason, as well.

Even if Composite had adequately prepared for contingencies, which it appears plaintiff may not have done, it is not certain that the production and delivery schedules proposed by Composite could have met contract due dates. The government, contrary to plaintiff's assertions, contends that even the milestone plan Composite submitted to the Navy did not comply with delivery dates under the contract and showed completion dates subsequent to the last day for contract performance. The court finds that, given the limited information provided to the court for the purposes of this summary judgment proceeding, it is impossible to make the necessary factual determinations to decide the case on summary judgment. This is particularly true because there is no way to match up the due dates listed on page two of the contract, with the Milestone Chart on Composite Laminate stationary, included as an attachment to plaintiff's August 23, 1990 letter to the Navy.

Furthermore, if an adequate inspection system was required during the tooling phase, and the plaintiff's letter of August 31, 1990 suggests that one was required, then it is not clear that Advanced could have corrected the defects found during the Navy's survey of August 14, 1990 within ten days. It appears, as identified by the contracting officer in his August 22, 1990 letter to plaintiff, that Advanced also may have lacked the records and/or adequate recordkeeping procedures necessary to operate an inspection system. For example, the contracting officer noted that: Advanced could not provide documentation of subcontractor audits to indicate control of subcontractors; the receipt/inspection log was faulty as it did not indicate what happened to rejected material or what corrective actions were taken and proper documentation was not available on damaged government furnished material. There were other deficiencies as well, including a failure to calibrate instruments and tools were kept in areas without temperature or humidity controls.

It is also not clear that the tooling produced by Advanced met contract requirements. In a letter dated August 31, 1990, the plaintiff admitted that the tooling was "out of compliance to MIL–I–45208." Although Composite asserts that MIL–I–45208A did not apply to tooling, the wording of the contract, however, suggests that it may, in fact, have applied. Moreover, there is disagreement as to how much of the tooling was complete on August 29, 1990, the date of the termination notice. The plaintiff contends that tooling was 80 percent—85 percent complete. The government, however, disputes that figure, and maintains that in any event the tooling was unacceptable because it was manufactured out of compliance with MIL–I–45208A.

 Assuming, *arguendo*, that the plaintiff's assurances on alleged deficiencies were adequate, the evidence is unclear as to what extent those assurances were considered by the Navy. A termination for default is a harsh remedy, but when the court is convinced that the defendant exercised proper judgment in terminating the contract for default, the court will not substitute its judgment for that of the contracting officer. *International Verbatim Reporters, Inc. v. United States*, 9 Cl.Ct. 710, 715 (1986) (citing *Northrop Carolina, Inc. v. United States*, 213 Ct.Cl. 670, 553 F.2d 105 (1977)). A "contracting officer has discretion, but it is not unbridled, and it must be exercised in a fair and reasonable manner, not arbitrary and capricious, and

always in the best interest of the government." *Id.* (citing *Udis v. United States,* 7 Cl.Ct. 379, 387 (1985)). Or stated otherwise, "Procurement officials had to exercise judgment in terminating an agreement for default and were not automatons." *Schlesinger v. United States,* 182 Ct.Cl. at 581, 390 F.2d 702, 708. When there is administrative discretion under a contract, and the termination article is merely used as a "device" without making a judgment on the merits of the case, it is an abdication of responsibility which cannot be sanctioned. *Id.* On the other hand, a contracting officer cannot be faulted for failure to accept or verify bare assurances and representations from an unqualified source at a late date. *WEDJ Inc.,* 86–2 B.C.A. (CCH) ¶ 18,926 at 95,501 (ASBCA 1984). "To demonstrate that defendant's decision to terminate plaintiff's contract was arbitrary and capricious, plaintiff must show there was no reasonable basis for the adverse administrative decision or that the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *International Verbatim Reporters, Inc. v. United States,* 9 Cl.Ct. at 715 (citing *Olympia USA, Inc. v. United States,* 6 Cl.Ct. 550, 554 (1984)). Furthermore, as stated by the United States Court of Appeals for the Federal Circuit, "when a contractor persuades a court to find that the contracting officer's default decision was arbitrary or capricious, or that it represents an abuse of his discretion, the decision will be set aside." *Darwin Constr. Co. v. United States,* 811 F.2d 593, 598 (Fed.Cir.1987).

The plaintiff alleges that the Navy gave no indication that it considered any of Composite's efforts to cure. Further, the plaintiff maintains that the Navy both failed to respond to Composite's efforts and provided no basis for believing that the [Navy's] Survey team was doing anything more than going through the motions until the time to cure expired. Although it is unclear to what extent the defendant responded to the plaintiff's August 23, 1990 letter, contrary to the plaintiff's claims, it appears that the Navy did initiate numerous communications with the plaintiff by phone, letter and in-person. In addition, the Navy conducted a number of subcontractor surveys: on August 7, 1990 at Pacifica; on August 14, 1990 at Advanced; and on August 29, 1990 again at Advanced. While these contacts do not, in and of themselves, demonstrate that the Navy was not arbitrary or capricious, they do suggest that the Navy was more than a disinterested onlooker before, during, and after the cure period. There is, therefore, a genuine issue of material fact as to whether or not the Navy adequately considered Composite's assurances. The evidence presents numerous disagreements clearly sufficient to require submission to fact finding.

## CONCLUSION

In the instant case, in response to the motion for partial summary judgment filed by the plaintiff, the defendant has offered sufficient documentation in the record to show that there are material disagreements as to the facts presented to the court which require submission of the case to trial. In future proceedings the court believes the parties must focus, among other items, at least on the following issues, all of which are important to the disposition of this case: (1) was the letter of August 15, 1990 an adequate cure notice? (2) if the August 15, 1990 letter was an adequate cure notice, did Composite give adequate assurances of its ability to comply with the contract? (3) if Composite did give adequate assurances, did the Navy adequately take those assurances into account prior to issuing the termination notice? and (4) what was the true nature of the August 22, 1990 letter from defendant to plaintiff?

For the reasons discussed above, the court, therefore, DENIES the plaintiff's motion for summary judgment. By separate Order, a conference will be scheduled in the near future to set further proceedings in the case.

IT IS SO ORDERED.